UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

SAMI OMAR,

        Plaintiff,

    -against-

SHARIF OMAR, LIPTIS HOLDINGS LLC,
LIPTIS PHARMACEUTICALS USA, INC.,
OMAR HOLDING CORP. and NEW LIFE
HOLDING CORP.,

        Defendants.

-------------------------------------------------------------------x

Case No.: 24-cv-4758

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Sami Omar ("Sami"), by his attorney, Solomon Jaskiel, Esq., as and for his Complaint against Defendants Sharif Omar ("Sharif"), Liptis Holdings LLC ("Liptis Holding"), Liptis Pharmaceuticals USA, Inc. ("Liptis Pharma"), Omar Holding Corp. ("OHC") and New Life Holding Corp. ("New Life") alleges as follows:

## PARTIES

1. Sami resides in Puerto Rico at 5869 Avenida Isle Verde, Tower 1, Unit 1416, Carolina, P.R. 00979.

2. Sharif resides in the State of New York. Upon information and belief, he lives at 430 East 86th Street, Apt. 15F, New York, New York 10028.

3. Defendants Liptis Holding, Liptis Pharma, OHC and New Life are, upon information and belief, New York entities with their principal places of business at 110 Red Schoolhouse Road, Spring Valley, New York 10977.

## JURISDICTION AND VENUE

4. This court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) and (e) because the action is between citizens of different states and the amount in controversy exceeds $75,000.00.

5. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial amount of the events giving rise to Sami's claims occurred in this district.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

6. Sami and Sharif are members of an Egyptian family consisting of divorced parents, sisters and their spouses and their children.

7. Sharif is Sami's older brother by ten years and his oldest male sibling.

8. Sami, until mid-2018, felt an unwavering allegiance and loyalty to and dependence upon Sharif.

9. The allegiance, loyalty and dependence arose because Sharif had a significant role in raising Sami.

10. Until mid-2018, Sami trusted Sharif without question and followed his instruction and advice in all things related to family and business dealings.

11. Sharif was aware of Sami fealty to him.

12. Defendants Liptis Holding and Liptis Pharma (collectively, the Liptis Entities") is a pharmaceutical business. Liptis Pharma produces and sells pharmaceuticals upon land owned by Liptis Holding.

13. Defendants OHC and New Life, respectively, own valuable real estate in New York City. The real estate is leased to third parties at substantial profit. The Liptis Entities and OHC and New Life are collectively referred to herein as, the "Family Business".

14. Sami and Sharif's father started the Family Business. Between 2004 and 2009, their father turned over control of the Family Business to Sharif, primarily, and to Sami for it to be run by them for the benefit of the members of the family.

15. Sharif was granted and assumed primary control of the Family Business.

16. After 2008, Sharif made the final decision with respect to every significant financial transaction which the Family Business completed.

17. Sharif orchestrated the structure of every significant financial transaction which the Family Business made after 2008.

18. Until mid-2017, Sami assisted Sharif in the operation of the Family Business.

19. The other family members were barely involved in the operation and management of the Family Business.

20. The family members justifiably placed their trust in Sharif and Sami as the males of the family.

21. Under Sharif and Sami's control, Liptis Pharma grew and became quite successful.

22. During the relevant period, each member of the family had some ownership interest in each of the corporations which comprise the Family Business.

23. To finance the purchase of Liptis Holding's property, to grow Liptis Pharma's operations and to make personal investments, Sharif, a number of times, over the years, used OHC and New Life's property as collateral for loans.

24. Sharif used OHC and New Life's property as collateral without the knowledge and consent of other family members.

25. The lenders were falsely told by Sharif that the family members consented to the collateralization.

26. At the request of the lender, Sharif induced Sami to become a strawman borrower for some of the financing transactions. The proceeds of the loans went immediately to one of the Liptis Entities.

27. In connection with one of the loans to OHC, Sami signed a note (the "Note"), which, on paper made him appear to be liable for the proceeds of the loan, although Sami did not receive any of the proceeds of the loan.

28. It was understood between Sharif and Sami that the debts were not support by consideration and no efforts would be made to collect them. The mortgage loans were intended to be repaid by the Liptis Entities, since they received the benefit of the loan, and they did pay the mortgages loans.

29. At one point, Sharif induced Sami to fool the other family members into signing documents which transferred to Sharif their ownership interests in the Liptis Entities. The purported transfers gave Sharif more than 50% of the ownership of the Liptis Entities.

30. Around the same time, Sharif induced Sami to fool family members into

signing documents which granted Sharif, in writing, total control over OHC.

31. Sami trusted Sharif that Sharif was doing this for the good of the family.

32. The unauthorized collateralization and fraudulent transfers of stock and control are the subject of claims asserted by the affected family members in an action in state court.

33. In the years 2015 and 2016, Liptis Pharma was quite successful.

34. Sharif and Sami agreed that they would take profits from the business.

35. They both took profits from Liptis Pharma around that time.

36. Throughout the years, the Family Business paid significant sums of money to the family members who did not work in the Family Business. This was done in furtherance of the understanding that the Family Business was to be run for the benefit of the entire family.

37. The payments were made at Sharif direction.

38. Since the time he took control, Sharif had full access to the Family Business' bank accounts.

39. Sharif, as a matter of course, reviewed the Family Business' bank accounts and was aware of the transactions therein.

40. At all times, Sharif was aware of the payments made to Sami and the other family members.

41. At all times, Sharif authorized the payments made to Sami and the other family members.

42. One accounting firm prepared the tax returns for the Family Business and

for the family members who received payments from the Family Business.

43. Sharif controlled all the financial information that was provided to the accounting firm.

44. Sharif controlled the manner in which financial information was reported and the characterization given to each transaction.

45. Sami and the affected family members trusted that Sharif reported and characterized the information in a manner that was best for them and the family.

46. In October 2017, Sharif initiated a meeting with Sami regarding Sami's ownership of shares in the Liptis Entities. At that time, Sami owned 45 % of the shares of Liptis Pharma and 45% of the shares of Liptis Holding.

47. In the meeting, Sharif presented an ultimatum to Sharif: either Sami, that day, agreed to sell him the overwhelming majority of his shares for a nominal amount or he would be fired by each of the companies comprising the Family Business. Sharif stated that after the sale, everything would remain the same: Sami would be paid a salary and he would continue to share in the profits of the Business. Sharif stated that he needed an answer that day or else Sami would be fired.

48. Sharif told Sami that if Sami was fired he would never see a penny from any of the Family Business. Sharif would not pay him his share of the considerable profits without litigation. At the time, Sami was still under Sami's influence.

49. Sami asked Sharif why he was demanding the sale. He answered that he was concerned that Sami might die and Sharif might then lose control of the company.

50. At that point, Sharif maintained de facto control of the Family Business

and the power to cut Sami off from all his income. Sami believed that the changes in shares would be for everyone's benefit. He also believed that he had no choice but to agree. He knew that Sharif could be ruthless if his will was not followed. Having, is his mind, no reasonable choice, Sami signed agreements by which he would sell all his holdings in the Liptis Entities except for 1% (the "Liptis Sales Agreements").

51. No reason for the sale was given, other than that Sami might die.

52. Sharif and Sami did not discuss a price for the sale. The Liptis Sales Agreements contained an arbitrary sales price for the shares. Sharif set the price. The number were not based on reality and not discussed. The actual value of Sami's shares was far, far more that the amount of the consideration set forth in the Liptis Agreements.

53. The Liptis Sales Agreements were drafted by the law firm which had been doing the corporate work for the Family Business. The same firm drafted the fraudulent transfer documents which transferred to Sharif the other family members' ownership interests in the Liptis Entities. Sharif was the primary contact of the Family Business with the law firm.

54. Sami was not represented by counsel in connection with the Liptis Sales Agreements. Sharif and the law firm knew this.

55. Shortly after the Liptis Sales Agreements were signed, Sharif started undermining Sami's position in the Family Business. He started questioning many decisions that Sami had routinely made before. He started giving to employees duties which Sami had previously performed. He then stopped paying Sami his salary. He pushed Sami out of the Family Business. Sami had no choice but to resign.

56. In December 2017, at Sharif's direction, the Family Business stopped making payments to the family members who had been receiving payments.

57. These family members started asking questions and investigating. They learned how Sharif had illicitly obtained control of the Family Business and had now cut the family members out. Initial efforts to settle the dispute were not successful.

58. In the spring of 2018, Sami attempted to reach a resolution of the family dispute. As part of that, he decided to pursue the severance of all connection with Sharif and the Family Business. He and Sharif began discussing exchanging general releases and the relinquishment by Sami of any remaining stock he owned. He was willing to give up his valuable remaining shares in the Family Business only if he obtained a complete release. Sami also urged Sharif to make peace with other family members.

59. After a number of brief conversations, Sami and Sharif agreed to exchange general releases among themselves and the Family Business and that Sami would transfer his remaining shares without the transfer of money. Within days of the agreement, on or about June 26, 2018, Sharif sent one of the attorneys of the law firm which had been representing the Family Business to Sami's abode in Las Vegas. The attorney was an old family friend, who Sami trusted. He presented Sami with a proposed written release and with documents effectuating the transfer of the remaining stock. The release proposed to release Sharif, the Family Business, any business related to the Family Business and of Shariff's immediate family including his children. The documents did not include a release from these people and entities in favor of Sami ("Reciprocal Release").

60. Sami then, while the attorney was in his abode, called Sharif and asked

about the Reciprocal Release. Sharif promised Sami that as soon as he received Sami's release he would send Sami a signed Reciprocal Release. Sami trusted and believed him. He thought that Sharif wanted to completely end all issues between them. He could not comprehend that Sharif would be so vile as to obtain a release from him and obtain his remaining shares but not perform his agreement to provide the Reciprocal Release.

61. He was not sent the papers in advance of the meeting. He had little time to study them. Sharif and the attorney knew that and that he did not have an attorney representing him at the time, despite what the documents say.

62. Sami signed all the papers presented to him by the attorney including the proposed release (the "purported Release"), a Stock Purchase Agreement by which Sami transferred his 31.9% shares in OHC to Sharif (the "OHC Stock Purchase Agreement"), and agreements transferring his remaining ownership interests in the Liptis Entities.

63. Sami's shares in OHC were worth, at the time, an amount far greater than $6.0 million.

64. The consideration stated for the transfer of the OHC's shares was purported monies taken by Sami from the Family Business. Such consideration was illusory since Sami he had right to take those monies.

65. Sami, at the time, has a claim against New Life and Sharif for almost $6.0 million based upon their failure to pay him for shares he sold in 2017. He was willing to release that claim to obtain complete severance from Sharif and the Family Business.

66. Sami did not receive the Reciprocal Release, as agreed upon. He called Sharif soon thereafter to ask him about it. Sharif did not pick up the phone. He has yet to

receive the Reciprocal Release.

67. The purported Release, the OHC Stock Purchase Agreement, and the agreements transferring the remaining interests in the Liptis Entities were a part of the overall agreement between Sami and Sharif that included Sharif's obligation to deliver a Reciprocal Release. They were discussed and agreed to as one package. The intent of the overall agreement was for Sami to walk away without any obligations to or from Sharif and the Family Business. Sharif's failure to deliver the Reciprocal Release was a fundamental breach of the overall agreement.

68. On August 9, 2018, less than two months after Sami signed the purported Release, OHC, controlled by Sharif, commenced an action against Sami in federal court seeking to recover $7,459,338.71. The action is *Omar Holding Corp v. Sami Omar*, S.D.N.Y., 19- CV-06360 (MMG) (KNF). The claim is based upon the Note, which, as stated earlier, was a strawman loan that Sami had undertaken to help the Liptis Entities obtain funding. One defense asserted by Sami in the case is failure of consideration since he did not receive any monies from OHC. The Reciprocal Release would have released the claim underlying this action.

69. Sami transferred his shares in OHC for illusory consideration, which is stated in OHC Stock Purchase Agreement as the monies he took from the Family Business. OHC, controlled by Sharif, has also claimed these same monies as consideration for the Note.

70. Prior to his signing the purported Release, Sami had an indemnification claim against the Liptis Entities for the funds that OHC is claiming against him. The

Liptis Entities' books and records showed such a liability. If the purported Release stands, he might be found liable for a purported loan he took from OHC to benefit the Liptis Entities but will not be able to collect from the Liptis Entities.

**AS AND FOR A CAUSE OF ACTION AGAINST SHARIF
AND THE FAMILY BUSINESS
(First Cause of Action; Recission)**

71. Sami's execution of the purported Release, of the OHC Stock Purchase Agreement, and of the agreements selling the remaining interests in the Liptis Entities were contingent upon Sharif delivering the signed Reciprocal Release.

72. Sami performed his part of the agreement. Sharif and the Family Business did not.

73. There has been a complete failure of consideration for the purported Release, of the OHC Stock Purchase Agreement, and of the agreements selling the remaining interests in the Liptis Entities.

74. The purported Release, the OHC Stock Purchase Agreement, and the agreements selling the remaining interests in the Liptis Entities are void due to failure of consideration.

**AS AND FOR A CAUSE OF ACTION AGAINST SHARIF
AND THE FAMILY BUSINESS
(Second Cause of Action; Recission- Fraud)**

75. Sharif never intended to deliver a Reciprocal Release.

76. He deliberately lied to Sami when he told him that he would deliver the Reciprocal Release.

77. Sharif lied with the intention to induce Sami to deliver the purported Release. Sharif knew he could attempt to hide behind the language set forth in the documents.

78. Sami, based upon his relationship with Sharif, justifiably relied on Shariff's promise to him.

79. Because the documents Sami signed and delivered that day were induced by fraud, they should be rescinded.

### AS AND FOR A CAUSE OF ACTION AGAINST SHARIF AND THE FAMILY BUSINESS
(Third Cause of Action; Unconscionabilty)

80. The OHC Stock Purchase Agreement purportedly effectuated a transfer of Sami's OHC stock worth more than $6.0 for illusory consideration.

81. The purported Release purportedly released a claim for the proceeds of the sale of Sami's New Life's stock against New Life and Sharif in the amount of almost $6.0 million.

82. The failure to deliver the Reciprocal Release left a claim against Sami by OHC in the amount of the Note, almost $7.5 million plus interest, even though Sami purportedly transferred his OHC shares.

83. The purported Release released an indemnification claim Sami had against the Liptis Entities for any monies he might have to pay to satisfy the Note.

84. Sami received no consideration for the purported Release.

85. It would simply be both procedurally and substantively unconscionable to allow these agreement to remain enforceable.

86. Sami seeks a declaration that the purported Release, the OHC Stock Purchase Agreement, and the agreements selling his remaining interests in the Liptis Entities are unenforceable.

**AS AND FOR A CAUSE OF ACTION AGAINST SHARIF
AND THE FAMILY BUSINESS**
(Fourth Cause of Action; Breach of Contract)

87. There was an agreement that if Sami signed the purported Release, the OHC Stock Purchase Agreement, and the agreements selling the remaining interests in the Liptis Entities, Sharif and the Family business would sign and deliver the Reciprocal Release.

88. Sami performed his part of the agreement. Sharif and the Family Business did not.

89. Sharif and the Family Business should be compelled to sign and deliver a Reciprocal Release to Sami.

**WHEREFORE**, Plaintiff Sami Omar respectfully prays as follows:

(a) On the first and second causes of action, a judgment against all defendants declaring that the purported Release, the OHC Stock Purchase Agreement, and the agreements selling the remaining interests in the Liptis Entities are null and void;

(b) On the third cause of action, a declaration that the purported Release, the OHC Stock Purchase Agreement, and the agreements selling the remaining interests in the Liptis Entities are unenforceable;

(c) On the fourth cause of action, in the alternative, a judgment directing

Sharif and the Family Business to deliver a general release to Sami;

      (d)      The costs and disbursements of this action; and

      (e)      Such other and further relief as may just and proper.

Dated: Brooklyn, New York
         June 21, 2024

                                                  s/ Solomon J. Jaskiel_____
                                                  SOLOMON J. JASKIEL, ESQ.
                                                  *Attorney for Plaintiff*
                                                  *Sami Omar*
                                                 1601 East 23rd Street
                                                 Brooklyn, New York 11229
                                                 (917) 968-8368
                                                 soljas@gmail.com