UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

SAMI OMAR,

                                           Case No.: 24-cv-4758 (MMG)

             Plaintiff,

       -against-

SHARIF OMAR, LIPTIS HOLDINGS LLC,
LIPTIS PHARMACEUTICALS USA, INC.,
OMAR HOLDING CORP. and NEW LIFE
HOLDING CORP.,

             Defendants.

----------------------------------------------------------------x


**MEMORANDUM OF LAW OF PLAINTIFF SAMI OMAR
<u>IN OPPOSTION TO MOTIONS TO DISMISS</u>**


SOLOMON J. JASKIEL, ESQ.
*Attorney for Plaintiff Sami Omar*
1601 East 23rd Street
Brooklyn, New York 11229
(917) 968-8368  (SJJ-0671)

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ i

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 3

ARGUMENT ............................................................................................................ 8

    A.    Legal Standards for Motions to Dismiss ..................................................... 8

    B.    Sharif Perpetrated An Actionable Fraud Upon Sami ................................ 10

    C.    The Failure to Deliver the Agreed Upon Consideration
        Voids the Release and the Stock Agreements ........................................... 12

    D.    Sharif's Delivery of the Reciprocal Release
        Was a Condition Precedent to the Delivery
        of the Release and the Stock Agreements ................................................. 13

    E.    Sami Has Stated a Cause of Action
        for Rescission Based Upon Unconscionability ........................................ 14

    F.    Sami Has Stated a Breach of Contract Cause of Action ........................... 17

    G.    The Release Does Not Bar the Claim in this Action ................................. 17

    H.    The Parol Evidence Rule and the Merger Clauses Do Not
        Bar the Introduction of the Evidence of Sharif's Fraud ........................... 22

    I.    The Parol Evidence Rule and the Merger Clauses Do Not
        Bar the Introduction of Evidence of the Undelivered Consideration ........ 24

    J.    The Parol Evidence Rule and Merger Clauses
        Does Not Bar the Evidence of the Unfulfilled Condition
        Precedent to the Delivery of the Release and Stock Agreements ............. 25

    K.    Laches Is A Defense Which is Not Properly
        Determined on these Motions to Dismiss ................................................. 27

    L.    Sharif Waived Service of Process ............................................................. 28

M.    If Claims in this Action Survive, this Action and
      the Note Case Will Likely be Joined in Some Manner ............................ 29

CONCLUSION ............................................................................................................. 31

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*,
  25 N.Y. 3d 1043 (2015)............................................................................................11

*Adam v Jacobs*,
  950 F.2d 89 (2d Cir 1991)........................................................................................29

*Angerosa v White Co.*,
  248 A.D. 425 (4th Dept 1936) *aff'd*, 275 N.Y. 524 (1937)........................................23

*Apfel v. Prudentia-Bache Sec.,*
  81 N.Y. 2d 470 (1993)..............................................................................................16

*Arfa v. Zamir*,
  76 A.D.3d 56 (1st Dep't 2010), *aff'd*, 17 N.Y.3d 737 (2011)....................................18

*Bank of America Nat'l Trust & Sav. Ass'n v. Envases Venezolanos, S.A.*,
  740 F. Supp. 260, 267 (S.D.N.Y. 1990) ....................................................................15

*Bensky v. Indyke*,
  743 F. Supp. 3d 586 (S.D.N.Y 2024)........................................................................21

*Brennan v. Bally Total Fitness*,
  198 F. Supp 2d 377 (S.D.N.Y. 2002) ........................................................................16

*Cahill v. Regan*,
  5 N.Y. 2d 292 (1959)................................................................................................20

*Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*,
  17 N.Y. 3d 269 (2011)..........................................................................................18, 21

*Chadha v. Wahedna,*
  206 A.D.3d 523 (1st Dept 2022)................................................................................22

*Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*,
  4 N.Y. 2d 407 (1958)................................................................................................10

*Clearview Concrete Prods. Corp v S. Charles Gherardi*,
  88 A.D.2d 461 (2d Dept 1982)..................................................................................28

*CyCan, LLC v. Palladian Health, LLC*,
  217 A.D. 3d 1446 (4th Dep't 2023) ..........................................................................18

*Danann Realty Corp. v. Harris*,
  5 N.Y. 2d 317 (1959)..........................................................................................23

*DDJ Mgt., LLC v. Rhone Group L.L.C.*,
  15 N.Y. 3d 147, 155 (2010)................................................................................11

*Ehrlich v American Moninger Greenhouse Mfg. Corp.*,
  26 N.Y.2d 255, 258 (1970).................................................................................24

*Fopeco, Inc. v. General Coatings Tech., Inc.*,
  107 A.D.2d 609 (1st Dep't 1985) .....................................................................12

*Gibli v Kadosh*,
  279 A.D.2d 35 (1st Dep't 2000) ........................................................................22

*Gorunkati v. Baker Sanders, LLC*,
  179 A.D. 3d 904 (2d Dep't 2020) .....................................................................20

*Gotham Structures NY LLC v. LRC Constr. LLC*,
  2022 N.Y. Misc. LEXIS 48365 (Sup Ct. West. Co. 2022)...........................21

*Grannis v Stevens*,
  216 N.Y. 583 (1916)...........................................................................................27

*Hadden v Consol. Edison Co.*,
  45 N.Y. 2d 466 (1978)........................................................................................23

*Hicks v. Bush*,
  10 N.Y. 2d 488 (1962).................................................................................13, 25

*International Assets Corp. v. Axelrod*,
  245 A.D. 300 (1st Dep't 1935) ..........................................................................25

*Johnson v. Lebanese Am. Univ.*,
  84 A.D.3d 427(1st Dep't 2011)....................................................................20, 21

*Jones v. Jacobs*,
  234 A.D. 3d 594 (1st Dep't 2025) ....................................................................19

*Khurana v. Wahed Invest, LLC*,
  2020 U.S. Dist. LEXIS 4762 (S.D.N.Y. Jan. 8, 2020)...................................8

*Leasing Service Corp. v. Broetje*,
  545 F. Supp. 362 (S.D.N.Y. 1982) ...................................................................15

*Leasing Service Corp. v. Graham*,
   646 F. Supp. 1410 (S.D.N.Y. 1986) ............................................................15

*Long Island Trust Co. v. International Institute for Packaging Education, Ltd.*,
   38 N.Y. 2d 493 (1976)...................................................................................26

*Madeof, LLC v. Bronson*,
   2019 N.Y. Misc LEXIS 1904 (Sup. N.Y. Co 2019) ....................................22

*Magi Communications, Inc. v. Jac-Lu Associates*,
   65 A.D. 2d 727 (1st Dep't 1978) ..................................................................23

*Mangini v. McClurg*,
   24 N.Y. 2d 556 (1969)...................................................................................17

*Maynor v. Pellegrino*,
   226 A.D.2d 883, 885 (3d Dep't 1996) ..........................................................10

*MBIA Ins. Co. v. GMAC Mtge. LLC*,
   30 Misc. 3d 856, 861 (Sup Ct, NY Co. 2010) .............................................11

*McNeil v. Mohammed*,
   32 A.D.3d 829 (2d Dep't 2006) ...................................................................10

*Michael Kors Co v Compagnia Internazionale Abbigliamento S.P.A.*,
   1996 US Dist LEXIS 13024 *13 (S.D.N.Y. Sep. 5, 1996) ..........................24

*Millerton Agway Cooperative, Inc. v. Briarcliff Farms, Inc.*,
   17 N.Y.2d 57 (1966) ....................................................................................23

*Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.*,
   269 F. Supp 2d 206 (S.D.N.Y. 2003) ....................................................26, 27

*Paulino v. Braun*,
   170 A.D. 3d 506 (1st Dep't 2019)............................................................ 21/ 22

*Republic of Turkey v. Christie's Inc.*,
   62 F.4th 64 (2d Cir 2023).........................................................................27, 28

*Robinson v. Day*,
   103 A.D. 3d 584 (1st Dep't 2013)................................................................16

*Rudman v Cowles Communications*,
   30 N.Y.2d 1 (1972).......................................................................................12

*Ruppert v. Singhi*,
    243 N.Y. 156 (1926)..................................................................................25

*Sabo v Delman*,
    3 N.Y.2d 155, 162 (1957)...................................................................23, 25

*Schlaifer Nance & Co. v. Estate of Warhol*,
    119 F. 3d 91 (2d Cir 1997) ..........................................................................11

*Shields v. Citytrust Bancorp., Inc.*,
    25 F. 3d 1124 (2d Cir 1994)........................................................................10

*Slavin v. Victor*,
    563 N.Y.S.2d 407 (1st Dep't)......................................................................12

*Smith v. Dotterweich*,
    200 N.Y. 299 (1911)............................................................................13, 25

*Sletten v. LiquidHub, Inc.*,
    2014 U.S. Dist. LEXIS 94697 (S.D.N.Y. July 10, 2014)..............................9

*State v Wolowitz*,
    96 A.D.2d 47 (2d Dep't 1983) .....................................................................15

*Stewart v Jackson & Nash*,
    976 F.2d 86 (2d. Cir 1992).........................................................................10

*Su Nam Bu v. Sunset Park Deli of NY Corp.*,
    36 Misc 3d 1233(A), 2012 NY Slip Op 51584(U)(Sup. Ct Kings Co. 2012)...............23

*Ten Eyck v Whitbeck*,
    156 N.Y. 341 (1898)....................................................................................21

*Thomas v Scutt*,
    127 N.Y. 133 (1891)........................................................................12, 24, 25

*Tribune Printing Co. v. 263 Ninth Ave. Realty, Inc.*,
    57 N.Y.2d 1038 (1982).................................................................................10

*Tropical Leasing, Inc. v Fiermonte Chevrolet, Inc.*,
    80 A.D.2d 467, 469 (4th Dep't 1981) ..........................................................27

*Wechsler v. Diamond Sugar Co., Inc.*,
    29 A.D.3d 681 (2d Dep't 2006) ...................................................................20

iv

*Zuckerman v Metro. Museum of Art*,
   928 F. 3d 186 (2d Cir. 2019) ........................................................................28

## **Statutes**

N.Y. General Obligations Law § 15-303 ...........................................................13

Plaintiff Sami Omar submits this Memorandum of Law in opposition to the motions to dismiss brought by the Defendants, Sharif Omar ("Sharif"), Liptis Holdings LLC ("Liptis Holding"), Liptis Pharmaceuticals USA, Inc. ("Liptis Pharma")[1], Omar Holding Corp. ("OHC") and New Life Holding Corp. ("New Life").[2]

## PRELIMINARY STATEMENT

The facts, as well pleaded in the Complaint, are *sui generis* and egregious.  They allege a diabolical scheme by Sharif, Sami's brother, to grab Sami's remaining rights in the Family Business for very little money, obtain releases for himself, the Family Business, his other companies, and his family and deny Sami the sole consideration he bargained for – a reciprocal release.   The sole purpose of the agreements by which Sami gave up so much was to sever all business ties with Shariff and the Family Business.  Instead, Sharif took it all and still pursues Sami.

Shariff accomplished this by lying to Sami.  Brendan J. DeRiggi, Esq., Sharif's attorney, assisted him.  The terms of the overall agreement were in place.  Sami gives up all his shares in the Family Business and the parties exchange releases.  DeRiggi confirmed this in a text, after Sam asked him: "Will the inter-company loans that were in my name be addressed in the documents?".  DeRiggi responded: "**Everyone will exchange releases**."

After this, DeRiggi travelled to Las Vegas, where Sami then lived, to have Sami sign the papers and receive the reciprocal release.  Before he arrived, despite repeated

---

[1]    Liptis Pharma and Liptis Holding are the Liptis Entities.

[2]    The Defendants other than Sharif are collectively the Family Business.

requests, he did not give the documents to Sami for his review.  He arrived and then presented only documents that were for Sharif's benefit.  Sami asked DeRiggi where is the release in my favor?  DeRiggi said speak to Sharif.  Sami called Shariff in De Riggi's presence and asked him the same question.  Sharif said I will send you mine when I receive yours.  Due to the nature of their relationship, Sami believed and trusted him.  He signed the documents, which included a broad release in favor of Sharif, the Family Business and others (the "Release") and agreements transferring Sami's remaining ownership interest in the Family Business (the "stock agreements") and gave them to DeRiggi.

Sharif had no intention to send the reciprocal release. Sharif intentionally lied to induce Sami to sign the Release. Under these circumstances, Sami had a right to rely on Sharif's statement.  The basis for the transaction was the reciprocal release.  Sami could not fathom that Sharif would deny him such an intrinsic term of the transaction.  Sharif fraudulently induced the signature and delivery of the Release and the stock agreements.

Sami seeks recission of the Release and the stock agreements.  They did not come into effect.  First, they were fraudulently induced.  Second, Sami did not receive the consideration he bargained for.  Third, the delivery of these documents were contingent on Sami receiving the reciprocal release.  Since Sharif did not deliver the reciprocal release, the delivery of the Release and the stock agreements was not complete and these documents did not come into effect. Fourth, if the Court holds that the above reasons do mandate recission, the Release and the stock agreements should be rescinded because to the allow the transaction to remain as Sharif has engineered it would be unconscionable.

Finally, at a minimum, Sharif should be direct to deliver the reciprocal release he agreed to deliver.

In this motion, Defendants, all controlled by Sharif, seek to dismiss all these claims, primarily by seeking to apply the language of the Release and of the stock agreements to the facts of this case.  Certainly, the law "is not such an ass."   It would not allow the language of documents: (a) induced by fraud, (b) for which the central item of consideration was not delivered and (c) were delivered on the condition that another document be delivered, to control.

The doctrine of unconscionability applies. It is not so limited as suggested by Defendants.

**STATEMENT OF FACTS**

Sharif is the oldest child in this family that has an Egyptian background.  Because of that and because he raised Sami and was Sami's elder by ten years, Sami trusted Sharif that he would do what was right for the family and for him.[3]

Prior to 2017, Sami and Sharif owned significant percentage of shares of each of the companies that comprised the Family Business.  They had been given the shares by their parents.  They were charged with running the Family Business for the benefit of the entire family.  To that end, their siblings received salaries.  Prior to 2017, Sami worked

---

[3]    Sharif had some sort of psychological control over Sami.  This can be seen in the text which DeRiggi sent Sami on July 10, 2018, less than three weeks after Sami signed the documents.  Texts, page 7.  The text states: "Sharif asked me to remind you not to speak with your family about anything."  For Sharif to have demanded, and apparently for to Sami have agreed, that Sami not tell his family, including his parents, that he had given away his remaining ownership of the Family Business indicates that Sharif had some degree of control over Sami. Sharif told Sami what to do with the expectation that Sami would listen.  Sharif asked this of Sami at a time when Sharif had deliberately failed to deliver a reciprocal release.

3

with Sharif, while Sharif maintained control and made all the important decisions.  Prior to

2017, Sharif and Sami took significant funds from the Family Business.

      Prior to 2017, Sharif had induced Sami, through his trust in and control of him, to

cause their siblings to sign documents transferring their shares in the Liptis Entities to

Sharif.  He induced Sami to sign documents by which it seemed as if Sami was had

received monies from the proceeds of mortgages on New Life and OHC and by which

Sami undertook repayment obligations when the monies went to the Liptis Entities and the

payment obligations belonged to the Liptis Entities.  One of the documents Sami signed

was a note in favor of OHC for the sum of $9.0 million (the "Note")**.**  A lender had

demanded that such a note be signed to support a loan to be given to the Liptis Entities.

Sharif induced Sami to sign the Note, despite all monies having gone to the Liptis Entities.

Sami signed the Note because Sharif told him to and it was understood that OHC,

controlled by his brother, would not enforce the Note.  The Note could only be used by the

lender.

      In 2017, Sharif induced Sami to transfer to him significant portions of the

ownership of the Liptis Entities and New Life.  By that time, each of the companies were

very valuable.  **Each of the agreements for the transfer of Sami's ownership contained**

**mutual releases.**  This means that Sharif, the Liptis Entities and New Life released Sami in

the same agreement by which Sami released Sharif, the Liptis Entities and New Life.  See

*Membership Interest Purchase Agreement*, dated as of October 23, 2017, of the interests of

Liptis Holdings LLC, para. 10, pages 3-4, Exhibit A to the Declaration of Donald Feerick,

Esq., dated March 28, 2025 (the "Initial Liptis Holding Agreement"); *Stock Purchase*

*Agreement*, dated as of October 23, 2017, of the shares of Liptis Pharma, para. 10, page 4, Exhibit B to the Feerick Dec. (the "Initial Liptis Pharma Agreement"); *Stock Purchase Agreement*, dated as of April 1, 2017, of the shares of New Life, para. 8, pages 3-4, Exhibit C to the Declaration of Philip J. Campisi, Esq., dated March 28, 2025 (the "Initial New Life Agreement").[4]

The consideration set for in the Initial Liptis Holding Agreement and the Initial Liptis Pharma Agreement were way below the value of the ownership being sold. In the Initial New Life Agreement, Sharif agreed to pay $6,425,000 for Sami's shares. Sharif does not give any pretense that he paid anything close to this amount to Sami.

Despite his assurances to the contrary, after Sami signed the initial agreements, Sharif forced Sami out of the Family Business. He cut of his duties and salary. He cut off the salaries the Family Business previously gave to the other family members. These family members began investigating and family strife erupted.

In mid-2018, Sami decided that he wanted to sever all remaining connections to the Family Business. This meant that he would engage in a transaction by which he would owe nothing to Sharif and the Family Business, and they would owe nothing to him. At the time, he owned approximately 31% of the shares of OHC. The shares were worth more

---

[4] The effect of Sami's release of the Liptis Entities in the Initial Liptis Agreements was that, on paper, Sami remained liable for the Note to OHC but he could not collect the loan from the Liptis Entities. OHC had taken a substantial mortgage on its property. The proceeds of the mortgage loan had gone to the Liptis Entities. On paper, Sami had signed the Note, undertaking the obligation to pay the "loan" that had gone to the Liptis Entities. On paper, the Liptis Entities owed Sami the money since the money had gone to the Liptis Entities. The releases in the Initial Agreements cut off, on paper, the Liptis Entities obligation to pay to pay Sami.

The fact is that the Liptis Entities always paid OHC's mortgage. Sami never paid anything on the Note.

than $6.0 million.  He was also still owed the lion's share of the $6,425,000 from the New

Life sale.  He was willing to forgo all that for a release from Sharif and the Family

Business.  Thereafter, Sami and Sharif would go their separate ways.

He contacted Brendan DeRiggi, Esq., an attorney.  Sami had known DeRiggi for a

long time. DeRiggi had represented the Family Business in various transactions over the

years.  He has also represented Sami in personal matters.  Sami understood that in this

transaction Deriggi was representing Sharif and the Family Business.  He understood that

DeRiggi was speaking for Sharif.  Sami and DeRiggi had a number of conversations.  They

exchanged texts.[5]  Through these conversations and texts, the parties arrived at the terms of

a general agreement along the lines of Sami's desire.

In one of the texts, Sam asked DeRiggi: "Will the inter-company loans that were in

my name be addressed in the documents?".  DeRiggi responded: "**Everyone will exchange**

**releases**." Texts, page 6.  In his question, Sami presumed that the terms of the transaction

were that loans would be released.  His question was whether the documents would reflect

the release. The import of DeRiggi's response is clear:  general releases would be

exchanged by everyone including the Family Business as part of the transaction.

That Sharif and each of the entities which comprise the Family Business would

provide releases to Sami was clearly part of the transaction.  This the plain meaning of a

reciprocal release.  Every person or entity who got a release from Sami would give a

release to Sami. Without that, there would not be the complete break Sami bargained for

---

[5]      A copy of the texts is annexed to the Sami Declaration, dated July 16, 2025, which accompanies the
memorandum.

when he was willing to give up his assets.  Sharif, in control of all the entities, agreed to this on his behalf and on behalf of the entities.[6]

DeRiggi made his way to Las Vegas, where Sami lived, to obtain Sami's signatures on the documents memorializing the transaction.  Prior to that, Sami asked DeRiggi for the drafts of the documents. See texts, dated June 22, 2018, page 6.  DeRiggi said that Sharif was reviewing them.  Sami then asked again by text on June 25, 2018.  DeRiggi did not honor the request but instead presented the documents to Sami when they met in the afternoon of the 26th.

Sami realized that the documents DeRiggi presented to him did not contain a reciprocal release, as agreed.  When he asked DeRiggi about the lack of a reciprocal release, Deriggi said call Sharif.  Sami called Sharif in Deriggi's presence.  DeRiggi should have heard at least Sami's side of the conversation.  Upon being questioned about the lack of release, Sharif said that when he receives Sami's release, he will send Sami the reciprocal release. Sami trusted that Sharif would keep his word especially because DeRiggi was witness to the terms and to the conversation.   He signed the documents presented to him without change. Later, it became clear that Sharif never had an intention of completing his side of the bargain, to deliver the only consideration that Sami would receive from this transaction.  Sharif lied to Sami about his intention and with that lie induced Sami to deliver the documents he signed that day. Also, Sami's delivery of the

---

[6]      Defendants somehow think that that Sharif only agreed to give a release on his own behalf.  The Complaint alleges otherwise.

documents he signed that day were contingent on the delivery to him of the reciprocal release.

Included in the stock agreements was a Stock Purchase Agreement of all Sami's shares of OHC, Exhibit E to the Campisi Dec. Paragraph 1(b) of Agreement states:

> The consideration for the Shares is Five Hundred Seventy-Seven Thousand Three Hundred Thirty-Five Dollars ($577,335.00) (the "Purchase Price"). The Seller acknowledges and agrees that the Purchase Price was previously paid by the Buyer to the Seller as a result of the Seller's charging of an amount equal to the Purchase Price, for personal purposes, on a corporate credit card of Liptis Pharmaceuticals USA, Inc., an entity now owned 100% by the Buyer.

The consideration was illusory since Liptis Pharma had already released Sami from all claims in the Initial Liptis Pharma Agreement, signed in 2017.

The stock agreements contained a provision by which Sami stated that he was represented by counsel or had the opportunity to be represented by counsel. This statement was false. DeRiggi and Sharif knew it was false. Sami certainly did not have counsel. Having been presented with the agreements for signature for the first time shortly before he signed them, he did not have the opportunity to be represented by counsel.

## **ARGUMENT**

### A. **Legal Standards for Motions to Dismiss**

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. The well pleaded facts must be accepted as true. *Khurana v Wahed Invest, LLC*,

2020 U.S. Dist. LEXIS 4762 (S.D.N.Y. Jan. 8, 2020)(citations and quotation marks omitted.)

Besides documents incorporated into the complaint by reference or those integral to the complaint, the Court has complete discretion to decide whether to accept the submission of any material beyond the pleadings offered in conjunction with a motion to dismiss and convert the motion to one for summary judgment. *Sletten v LiquidHub, Inc.*, 2014 U.S. Dist. LEXIS 94697 *11 (S.D.N.Y. July 10, 2014) (citations and quotation marks omitted.). A plaintiff may not shore up a deficient complaint with affidavits. *Id*.

Here, Sami has offered is declaration to correct certain minor errors and to amplify certain of the allegations of the Complaint. The Complaint would not be deficient without Sami's declaration. His declaration and, particularly, the texts between Sami and DeRiggi, provide more detail to the allegations that (a) an agreement to provide the reciprocal release was made and the agreement was so central to Sami that it was the one term he made sure DeRiggi would include in the documents, and (b) that DeRiggi and Sharif made sure that Sami did not see the documents before DeRiggi placed them before Sami for signature.

Sharif has submitted a declaration in which matters not integral to the Complaint are discussed. He denies agreeing to provide a reciprocal release, when he well knows that the allegations of the Complaint must be accepted as true. He has also submitted his bank account statement purportedly showing he paid consideration for the stock transfers that

are not at issue in this litigation.[7]  Since Sharif has submitted extraneous material, the

Court should exercise its discretion and consider Sami's declaration and the texts, which

merely amplifies the allegations of the Complaint.

**B.    <u>Sharif Perpetrated An Actionable Fraud Upon Sami</u>**

Sharif perpetrated a fraud upon Sami.  He lied about delivering to him a reciprocal

release.  It is well settled that a promise with the preconceived and undisclosed intention of

not performing it constitutes fraud. *Channel Master Corp. v Aluminum Ltd. Sales, Inc.*, 4

N.Y. 2d 407 (1958); *see also Tribune Printing Co. v 263 Ninth Ave. Realty, Inc.*, 57 N.Y.2d

1038, 1041 (1982) ("a false statement, promissory in nature, may be deemed the statement

of a material existing fact, because it falsely represents the [declarant's] state of mind and

the state of his mind is a fact'"); *Stewart v Jackson & Nash*, 976 F.2d 86, 89 (2d. Cir

1992) (representations of present fact include promises of future action if the declarant had

no intention of fulfilling the promise at the time it was made).[8]

He induced Sami to sign and deliver the Release and the stock agreements with his

lie.  Sami reasonably relied on Sharif's promise because he was a brother, who he trusted.[9]

---

[7]    OHC and New Life seem to need confirmation of this fact despite the clear language of the Complaint, which does not seek any relief relating to the Initial agreements.  OHC and New Life also seem to think that Sami does not seek any relief against them in the causes of action of the Complaint.  Sami seeks recission of the Release, which purportedly runs in favor of OHC and New Life.

[8]    The inference of fraudulent intent "may be established either (a) by [presenting evidence] to show that defendants had both motive and opportunity to commit fraud, or (b) by [presenting evidence] that constitute strong circumstantial evidence of conscious misbehavior or recklessness" *Shields v Citytrust Bancorp., Inc.*, 25 F. 3d 1124, 1128 (2d Cir 1994).

[9]    A sibling relationship satisfies the confidential relation requirement necessary to establish a constructive trust. *McNeil v. Mohammed*, 32 A.D.3d 829 (2d Dep't 2006); *Maynor v Pellegrino*, 226 A.D.2d 883, 885 (3d Dep't 1996).

This brother was able to get Sami to do his bidding as seen from the previous agreements he induced Sami to sign that were unfair to Sami. While here they were separating their business affairs, and to that extent they were adversaries, Sami had not at that point lost such trust in his brother to the extent that he should have anticipated that he would deprive him of the sole consideration he was to get for giving up so much.  Add to that DeRiggi's role.  Sami did not dream that DeRiggi would allow Sharif to trick Sami to such an extent.

The determination of whether a party's reliance is reasonable is "always nettlesome because it is so fact-intensive," and certainly cannot be determined in the present procedural context. *DDJ Mgt., LLC v Rhone Group L.L.C.*, 15 N.Y. 3d 147, 155 (2010), *quoting, Schlaifer Nance & Co. v Estate of Warhol*, 119 F. 3d 91, 98 (2d Cir 1997) (holding it is a question of fact whether a sophisticated party reasonably relied on facts contained in a bargained for contractual representation); *ACA Fin. Guar. Corp. v Goldman, Sachs & Co.*, 25 N.Y. 3d 1043, 1045 (2015); *MBIA Ins. Co. v GMAC Mtge. LLC*, 30 Misc. 3d 856, 861 (Sup Ct, NY Co. 2010) ("Reasonable reliance is a fact intensive inquiry, which should be reserved for a trier of fact").

The stock agreements were obtained by the same fraud and are, thus, also subject to rescission.  Sami would not have delivered the stock agreements if he knew he was not getting the reciprocal release. Sharif and the Liptis Entities admit: "The [Stock] Agreements are not separate from the Release."  Memorandum at 12.[10]  Actually, the

---

[10]    Footnote 1 of the Liptis Memorandum also states that the Release and the stock agreements were part of one transaction. The footnote also mentions that Sami "accepted the purchase money."  The Complaint does not allege any purchase money changed hands on or around June 26, 2018, the day the documents were signed.  The documents do not state "purchase money" for the OHC stock.  The

admission does not go far enough. The stock agreements, the Release *and* the reciprocal

release that Sharif agreed to give comprise one transaction and should treated that way. "In

determining whether contracts are separable or entire, the primary standard is the intent

manifested, viewed in the surrounding circumstances." *Rudman v Cowles*

*Communications*, 30 N.Y.2d 1, 13 (1972) (citations omitted); *Slavin v. Victor*, 563 N.Y.S.2d

407 (1st Dep't)("unconditional" promissory notes given as part of the sale of a business

cannot be viewed in a vacuum and can be voided if the purchase of the business was

induced by fraud). Here, the Release, the stock agreement and the promised reciprocal

release should be viewed as one transaction since they had one intent, to sever the

relationship, and were negotiated as one agreement. Nothing else explains why Sami

transferred his OHC shares for illusory consideration (the purported credit card charges

had been released in 2017) and gave up his rights to collect the New Life purchase price

from Sharif for nothing in return. Sharif, through DeRiggi, at one time, conducted all the

negotiations with Sami for all the agreements on behalf of himself and the Family

Business, which he controlled. As one agreement, Sharif's fraud voids all the parts of the

transaction including the stock agreements.


C.    **The Failure to Deliver the Agreed Upon Consideration**
      **Voids the Release and the Stock Agreements**

The failure to deliver the agreed upon consideration destroys the agreement upon

which the consideration rests. *Thomas v Scutt*, 127 N.Y. 133, 137-8 (1891); *Fopeco, Inc.*

---

consideration was the waiver of credit card charges made from the Liptis Entities. Those charges had been
released in the initial Liptis agreements. There was no money for Sami to accept.

*v. General Coatings Tech., Inc.*, 107 A.D.2d 609 (1st Dep't 1985).  Here, the agreed upon consideration for the Release and the stock agreements was the reciprocal release.  Sharif's failure to deliver the consideration, even if he had not lied to Sami, voids the effectiveness of these documents.

It is true that, under NY General Obligations Law § 15-303 , no consideration is needed to support a release.  All that means is that a party can release another party without having received something in return.  If there is no agreement that the releasor provide consideration, the release is still valid.  Here, the Complaint alleges a transaction by which Sharif was required to deliver the reciprocal release as consideration for the Release and the stock agreements.  N.Y. GOL § 15-303 does not dictate that if one party agreed to give consideration in exchange for a release and fails to do so, the release is not void.  Regular contract principles hold that failure of agreed upon consideration voids the agreement.[11]

### D.    Sharif's Delivery of the Reciprocal Release Was a Condition Precedent to the Delivery of the Release and the Stock Agreements

If a condition precedent to the delivery or effectiveness of an agreement does not occur, the agreement is not effective. *Hicks v. Bush*, 10 N.Y. 2d 488 (1962); *Smith v. Dotterweich*, 200 N.Y. 299, 306 (1911) ("An agreement needs a delivery to make the

---

[11]    Sami says the consideration for all the agreements was the reciprocal release. OHC claims that the OHC Stock Agreement is supported by the consideration stated therein.  The stated consideration is the waiver of credit charges purportedly made by Sami on the Liptis Entities' account.  This consideration was illusory, because any claim that the Liptis Entities had against Sami for those purported charges was released in 2017 by the mutual release contained in the Initial Liptis Entities Stock Agreements. This shows the one-sided nature of the agreements in favor of Sharif.

obligation operative at all and the effect of the delivery and the extent of the operation of the instrument may be limited by the conditions with which delivery was made.").

As DeRiggi stated and as is standard in all transactions in which general releases are given by both sides, releases are exchanged, presumably simultaneously. That should have happened here. It did not because the reciprocal release had not been prepared. Inherent in Sharif's commitment, by his words to Sami, was that Sami's delivery of the Release was not effective until and unless he received the reciprocal release. The effectiveness of the delivery of the Release was contingent on the delivery of the reciprocal release. Any other understanding would cause the absurd result (advocated by Defendants here) that Sharif could make the promise but then use the release, once he receives it, to get out of the promise. Since the reciprocal release was not delivered, the delivery of the Release did not become effective.

The same analysis applies to the stock agreements. These agreement were part of one transaction. The reciprocal release was, for Sami, the primary consideration for his giving up his shares. All the documents were to be delivered at one time. Sami delivered these documents only because he was promised that he would get the reciprocal release. His delivery of the documents was contingent on getting the reciprocal release. None were effective until Sami received the reciprocal release.

E.    **Sami Has Stated a Cause of Action
      for Rescission Based Upon Unconscionability**

"As a general proposition, unconscionability, a flexible
doctrine with roots in equity * * * requires some showing of 'an

14

> absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. This definition reveals two major elements which have been labeled by commentators, procedural and substantive unconscionability. The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract, per se.  Examples of the former include, but are certainly not limited to, high pressure commercial tactics, inequality of bargaining power, deceptive practices and language in the contract, and an imbalance in the understanding and acumen of the parties.  Examples of unreasonably favorable contractual provisions are virtually limitless but include inflated  prices, unfair termination clauses, unfair limitations on consequential damages and improper disclaimers of warranty.
>
> In determining the conscionability of a contract, no set weight is to be given any one factor; each case must be decided on its own facts.  However, in general, it can be said that procedural and substantive unconscionability operate on a "sliding scale"; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa."

*State v Wolowitz*, 96 A.D.2d 47, 67-69 (2d Dep't 1983)(citations and quotation marks omitted).

In the end, "the purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise." *Leasing Service Corp. v. Broetje*, 545 F. Supp. 362, 366 (S.D.N.Y. 1982), *cited in*, *Bank of America Nat'l Trust & Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F. Supp. 260, 267 (S.D.N.Y. 1990).  The Court must look to the transaction as a whole, and the atmosphere in which it was entered into in order to determine unconscionability. *Leasing Service Corp. v. Graham*, 646 F. Supp. 1410, 1418 (S.D.N.Y. 1986), *cited in*, *Bank of America Nat'l Trust & Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F. Supp. at 268.

These cases establish that no one factor is determinative.   The elements are not so well defined.  All the circumstance must be considered.   Certainly, not as Defendants would have the Court believe, if the party has some sophistication in the running of a business, *ipso facto* he cannot assert an unconscionability claim.   In this unique case, enough elements of procedural and substantive unconscionability exist to state a claim.

Procedural Elements:  There was no adversarial relationship since they were brothers.  There is no proof that Sami was sophisticated in legal matters. Sharif had dealt with the attorneys in the running of the Family Business. High pressure tactics was used by the sending of a lawyer to Sami's city to get the signature.  Disparate bargaining power existed since Sami was pushed out of the Family Business and was cut off from payments from the Family Business.   Deceptive practices existed since Sami asked but was refused access to the documents to review, even though he asked.  He had little time to study the documents.  The documents were drafted by Sharif's attorneys. He did not have a lawyer and was not given enough time to get a lawyer. Sami trusted DeRiggi.  Sami trusted his brother not to do him harm.  Sharif had control over Sami to make him do his bidding.[12]

---

[12]     Transactions between parties who share a confidential relationship, one of trust and confidence, are scrutinized for fairness and undue influence.  *Robinson v. Day*, 103 A.D. 3d 584, 585 (1st Dep't 2013).  The principle does only apply to the elderly and mentally incapacitated.  *Id*. In *Robinson*, the court applied the principle to parties in a romantic relationship, As stated above, siblings are also viewed as in a confidential relationship.  Here, that is particularly true due to Sharif's ability to get Sami to do his bidding.

     In *Robinson*, the plaintiff, who was in a confidential relationship with defendant, claimed that he received little or consideration of the agreements he executed.  The documents stated otherwise.  Because of the confidential relationship, the court held that the burden was on the other party to show that the transactions were fair.  The court applied the rule that if fraud and unconscionability has been alleged, the adequacy of consideration is a proper subject for judicial scrutiny. *Robinson* ,103 A.D.3d at 585, *citing, Apfel v. Prudentia-Bache Sec.*, 81 N.Y. 2d 470, 476 (1993).

Sharif told Sami that he would get the reciprocal release once Sami gave his.  *See  Brennan v. Bally Total Fitness*, 198 F. Supp 2d 377, 382 (S.D.N.Y. 2002)(high pressure and deceptive tactics are considered elements of a lack of meaningful choice).

Substantive Elements:  By the above means, Sharif received shares in OHC worth over $6.0 million. The stated consideration was illusory since the credit card payments were from Liptis Pharma, were salary and, in any event, released in 2017 by the Initial Agreements.  Sharif's obligation to pay Sami over $6.0 million for the shares in New Life, which Sharif had purchased in 2017, was released.  Sharif ended up with value of $12.0 million. He and the Family Business and Sharif's family got a general release.  Sami got nothing.  The substantive nature of the transaction, as Sharif would have one believe, are shocking.

If the Release and stock agreements are not rescinded because of the fraud, want of consideration and failure of condition precedent, they should be rescinded under the doctrine of unconscionability.

**F.**    **Sami Has Stated a Breach of Contract Cause of Action**

Sami asserts the breach of contract claim, if all else fails.  We have a simple promise by Sharif on behalf of himself and the Family Business, to give Sami a general release.[13]  If Sami proves it, the Court should enforce it.

**G.**    **The Release Does Not Bar the Claims in this Action**

---

[13]    Of course, Sharif could not make the agreement on behalf of his children.  They are, for that reason, not parties, to the action.

A release should not be enforced under circumstances and under rules which would result in a grave injustice. *Mangini v McClurg*, 24 N.Y. 2d 556, 563 (1969). Here, a grave injustice will have been committed if the Court allows a release obtained by such a fraud to be applied to preclude the claims in the Complaint.

Generally, a party that releases a fraud claim may later challenge that release as fraudulently induced if it can identify a separate fraud from the subject of the release. *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y. 3d 269, 276 (2011)(citations omitted)[14] Were this not the case, no party could ever settle a fraud claim with any finality. *Id*. Here, the words of the Release seem to release fraud claims. Nevertheless, the Release does not bar a claim based upon the fraud perpetrated by Sharif. His fraud is separate from the subject of the Release. As alleged, the intent of the Release and reciprocal release was to release all claims *previously existing* between the parties so the parties could go their separate ways. Shariff's lie, that he would provide a reciprocal release, was a fraud that did not exist or was contemplated at the time the Release was negotiated or given. Since such a fraud was not contemplated by the parties, it was not contemplated by the Release. If this was not true, then fraud could never be a basis to

---

[14]    *Centro* and other cases like it such as *Arfa v Zamir*, 76 A.D.3d 56 (1st Dep't 2010), *aff'd*, 17 N.Y.3d 737 (2011) discuss how an adversarial relationship existing between shareholders negates reasonable reliance on representations made or not made by one shareholder to the other. Those discussions have no application here. Sami and Sharif, although they were separating, were not adversaries and were still brothers. Moreover, as explained throughout the Complaint, Sami trusted Sharif. He did not consider that Sharif would betray him so brazenly and egregiously.

   In *Centro* and *Arfa*, the subject matter of the alleged fraud was contemplated in the release. The agreement containing the release dealt with issues relating to the alleged fraud. Here, the fraud being alleged has nothing to do with the purpose of the Release

avoid a general release.  Fraudsters like Sharif could induce the execution of a general release with a pack of lies and then wave the release in court. *See CyCan, LLC v. Palladian Health, LLC*, 217 A.D. 3d 1446, 1450-1 (4th Dep't 2023)(failure to disclose bribery scheme was fraud separate from the subject of a general release); *Jones v. Jacobs*, 234 A.D. 3d 594 (1st Dep't 2025)(general release not enforced due to allegation of fraudulent inducement).

In addition to the above, the fraud here goes to the heart of the reason the Release was given.  The only reason Sami executed the Release was to get the reciprocal release. The Release was not part of a larger agreement by which Sami would get some other benefit. Sami expected no other benefit from this transaction other than the reciprocal release. This fact distinguishes the facts of this case from all the cases cited by Defendants.[15]

Moreover, the Release would not have been delivered had Sharif not perpetrated the fraud.[16]  It was induced as part of scheme.  None of the case cited by Defendants concern a fraud so fundamental to the transaction.

Even if the Court finds that the wrongs perpetrated by Sharif was not separate from the subject of the Release,  the Court should decline to enforce the Release to bar the claims in the Complaint because (a) as a matter of the intent of the parties, Sharif's wrongful actions and failures was not contemplated by the Release since his actions and

---

[15]      In *Centro*, there was an agreement between the parties which encompassed many terms including a release.  Here, Sami's receipt of the reciprocal release was the central term of the transaction from Sami's perspective.

[16]      Sami has a cause of action that the Release did not become effective until the reciprocal release was delivered since the delivery of the Release was contingent on the delivery of the reciprocal release. That clam would exist even had Sharif not lied to Sami with the intent to cause him to deliver.

failures were not an issue prior to the transaction, and (b) the Release was not fairly and

knowingly given.

> "[T]he Court of Appeals has explained: "There is little doubt . . . that
> [a release's] interpretation and limitation by the parol evidence rule
> are subject to special rules. These rules are based on a realistic
> recognition that releases contain standardized, even ritualistic,
> language and are given in circumstances where the parties are
> sometimes looking no further than the precise matter  in dispute that
> is being settled. Thus, while it has been held that an unreformed
> general release will be given its full literal effect where it is directly or
> circumstantially evident that the purpose is to achieve a truly general
> settlement, *the cases are many in which the release has been avoided
> with respect to uncontemplated transactions despite the generality of
> the language in the release form*. Indeed, for a release to extend to
> claims both known and unknown, it must have been both fairly and
> knowingly made.  *This does not necessarily mean that the releasor
> must show that he or she was induced to execute the release by
> fraudulent means.* Rather, the requirement of an 'agreement fairly and
> knowingly made' has been extended . . . to cover other situations
> where because the releasor has had little time for investigation or
> deliberation, or because of the existence of overreaching or unfair
> circumstances, it was deemed inequitable to allow the release to serve
> as a bar to the claim of the injured party"

*Johnson v. Lebanese Am. Univ.*, 84 A.D. 3d 427, 429-30 (1st Dep't 2011)(emphasis added;

citations and quotation marks omitted).

The meaning and coverage of even a general release depends on the controversy

being settled and upon the purpose for which the release was given.  *Cahill v Regan*, 5

N.Y. 2d 292, 299 (1959)(court limited general release to the dispute between the parties);

*Gorunkati v Baker Sanders, LLC*, 179 A.D. 3d 904, 906 (2d Dep't 2020); *Wechsler v

Diamond Sugar Co., Inc.*, 29 A.D. 3d 681, 682 (2d Dep't 2006).  A release should not be

read to cover matters which the parties did not desire or intend to dispose of. *Cahill v

Regan*, 5 N.Y. 2d at 299   Here, the "controversy" being settled was the brothers being in

the family business together.  The purpose was to resolve all claims between them and the companies arising from that relationship.  Sami, by giving the Release, did not intend that it release claims that would arise from the transaction for which it was given.  The Release should not be interpreted to release the claims concerning the very consideration that should have been given to support it. *See Bensky v. Indyke*, 743 F. Supp. 3d 586, 593-4 (S.D.N.Y 2024)(a general release should not be interpreted to release claims unrelated to subject matter being resolved); *Gothham Structures NY LLC v LRC Constr. LLC*, 2022 N.Y. Misc. LEXIS 48365 (Sup Ct. West. Co. 2022)(general release was limited to the dispute it was intended to resolve; also, fraud alleged was separate from the release)

Furthermore, releases are effective regarding unknown fraud claims[17] only if the person signing it "knowingly and willingly" signs away this right. *Centro Empresarial*, 17 N.Y. 3d at 276.  A party can show that an agreement releasing liability was not fairly and knowingly made "where because the releasor has had little time for investigation or deliberation, or because of the existence of overreaching or unfair circumstances, it was deemed inequitable to allow the release to serve as a bar to the claim of the injured party" *Johnson v Lebanese Am. Univ.*, 84 A.D. 3d at 430.  Courts consider the "nature of the relationship between the parties that negotiated the release and the disparity between the consideration received and the fair value" *Paulino v Braun*, 170 A.D. 3d 506 (1st Dep't 2019).[18]   Here, in addition the procedural irregularities detailed in the section of this

---

[17]        It was unknow to Sami that Sharif had lied about his intent to deliver a reciprocal release to Sami.

[18]        "Where the relation between the parties is that of parent and child, principal and agent, or where one party is situated so as to exercise a controlling influence over the will and conduct of another, transactions between them are scrutinized with extreme vigilance, and clear evidence is required that the transaction was

memorandum dealing with unconscionability, Sami did not knowingly and willingly sign

away his right to claim that he was fraudulently induced to deliver the Release and the

stock agreements.  He did not know that the Release would foreclose these rights.[19]

      The above arguments apply to the claims for want of consideration, failure of

condition precedent, unconscionability and breach of contract.  With respect to want of

consideration, and failure of condition precedent, the Release never became effective such

that it would bar those claims.  Applying *Centro*'s test to those claims, those claims are

separate from the subject matter of the Release.  Those claims and the breach of contract

claim were not the subject matter being resolved between the parties and Sami did not

knowingly release those claims.  The unconscionability claim by itself would void the

Release.

### H.    The Parol Evidence Rule and the Merger Clauses Do Not Bar the Introduction of the Evidence of Sharif's Fraud

> In [New York State] protection is given to one who is injured by
> falsehood or deception; fraud vitiates everything which it touches, and
> destroys the very thing which it was devised to support; the law does

---

understood, and that there was no fraud, mistake or undue influence. Where those relations exist there must be clear proof of the integrity and fairness of the transaction, or any instrument thus obtained will be set aside or held as invalid between the parties." *Ten Eyck v Whitbeck*, 156 N.Y. 341, 353 (1898).

[19]    Cases have generally held that claims should *not* be dismissed based upon a release if there exist allegations that would support a finding that the release "was obtained under circumstances which indicate unfairness, overreaching and unconscionability" even though the allegations fell short of fraud.  *Gibli v Kadosh*, 279 A.D.2d 35, 41 (1st Dep't 2000)(citing cases); *Paulino v. Braun*, 170 A.D.3d at 506 (citing cases). While these cases have often been in personal injury situations, nothing in the law limits the application of these principles to these situations.  Here, the circumstances of the signing and delivery of the Release reveal unfairness, overreaching and unconscionability. *See Chadha v. Wahedna,* 206 A.D.3d 523 (1st Dept 2022)( in business context, court refused to enforce release in a motion to dismiss where allegation of overreaching and unfair circumstance are made); *Madeof, LLC v. Bronson*, 2019 N.Y. Misc LEXIS 1904 (Sup. N.Y. Co 2019)(in business context, court refused to enforce release in a motion to dismiss, where, *inter alia*, purported releasor was not represented by counsel, and did not know that the releasees were not acting in accordance with their fiduciary duty and were self-dealing)

> not temporize with trickery or duplicity. A contract, the making of which was induced by deceitful methods or crafty device, is nothing more than a scrap of paper, and it makes no difference whether the fraud goes to the factum, or whether it is preliminary to the execution of the agreement itself. . . . [F]raud is considered so abhorrent and repugnant that the court will not permit itself to be made a party to enforcing any agreement upon which the hand of deception has been laid . . ..

*Angerosa v White Co.*, 248 A.D. 425, 431-2 (4th Dept 1936) *aff'd*, 275 N.Y. 524 (1937),

*quoted in*, *Hadden v Consol. Edison Co.*, 45 N.Y. 2d 466, 470 (1978) and *Sabo v Delman*,

3 N.Y.2d 155, 162 (1957)(contractual promise made with the undisclosed intention not to

perform it constitutes fraud); *Millerton Agway Cooperative, Inc. v. Briarcliff Farms, Inc.*,

17 N.Y. 2d 57 (1966)(same). In these opinions, the courts held that the parol evidence rule

does not bar the admission of the evidence of the fraud to void the contract.

    The merger clauses in the stock agreements also do not bar the admission of

Sharif's perfidy.[20] Those clauses are general merger clauses as they do not specify the

particular representations that the parties are not relying upon. About such clauses, the

Court in *Magi Communications, Inc. v. Jac-Lu Associates*, 65 A.D. 2d 727, 728 (1st Dep't

1978) stated, *citing*, *Danann Realty Corp. v. Harris*, 5 N.Y. 2d 317 (1959)(emphasis

added): "[W]here the complaint states a cause of action for fraud, the parol evidence rule

is not a bar to showing the fraud – either in the inducement or in the execution -- *despite an*

*omnibus statement that the written instrument embodies the whole agreement, or that no*

*representations have been made.* Indeed, if it were otherwise, a defendant would have it in

his power to perpetrate a fraud with immunity, depriving the victim of all redress, if he

---

[20]    The Release does not contain a merger clause.

simply had the foresight to include a merger clause in the agreement.  Such is not the law."
*Sabo v. Delman*, 3 N.Y. 2d at 161. The merger clauses here have no effect on the
admissibility of the facts of Sharif's fraud.  *See Su Nam Bu v. Sunset Park Deli of NY
Corp.*, 36 Misc 3d 1233(A), 2012 NY Slip Op 51584(U)(Sup. Ct Kings Co.
2012)(collecting cases).

**I.    The Parol Evidence Rule and the Merger Clauses Do Not
       <u>Bar the Introduction of Evidence of the Undelivered Consideration</u>**

The parol evidence rule, which bars evidence to vary or contradict the terms of a
contract, does not bar evidence that the written document which purports to be an
agreement is in fact no contract at all.  *Thomas v Scutt*, 127 N.Y. at 137-8.  Since the
failure to deliver the agreed upon would void the contract, the parol evidence rule would
not bar evidence of the existence of such consideration and the failure to deliver it. *Id*.
(want of consideration may be shown by parol to destroy an agreement)

The consideration for the Release and for the stock agreements was the reciprocal
release.  Evidence of the agreement to provide this consideration and Sharif's failure to
deliver it is admissible to show that these contracts are void.

The Release states that the consideration is "the sum of TEN DOLLARS ($10.00)
and other good and valuable consideration."   The parol evidence rule may be used to also
show a recital of fact to be untrue, even in a fully integrated agreement. *Michael Kors Co.
v Compagnia Internazionale Abbigliamento S.P.A.*, 1996 US Dist. LEXIS 13024 *13

(S.D.N.Y. Sep. 5, 1996).  Here, the "other good and valuable consideration" was the

reciprocal release. [21]

Even with the stock agreements, since the failure of consideration voids the

contract, the merger clauses, since they are general, they should not bar the admission of

evidence of the existence of the other consideration and the failure of delivery.  A merger

clause provides another reason for applying the parol evidence rule. *Sabo v Delman*, 3

N.Y.2d 155, 162 (1957). Since the parol evidence rule does not bar evidence of the failure

of consideration, a general merger clause should not.


**J.    The Parol Evidence Rule and Merger Clauses**
**Does Not Bar the Evidence of the Unfulfilled Condition**
**Precedent to the Delivery of the Release and Stock Agreements**

Since an unfulfilled condition precedent to the delivery of a contract would prevent

the contract from coming into existence, the parol evidence rule will, generally, not bar

evidence outside the written contract that such a condition existed and was unfulfilled.

*Thomas v Scutt*, 127 N.Y. at 137-8; *International Assets Corp. v. Axelrod*, 245 A.D. 300 (1st

Dep't 1935).  However, this rule has a limitation:

> "[p]arol testimony is admissible to prove a condition precedent to the
> legal effectiveness of a written agreement if the condition does not
> contradict the express terms of such written agreement. A certain
> disparity is inevitable, of course, whenever a written promise is, by
> oral agreement of the parties, made conditional upon an event not

---

[21]    The Release also states that the consideration was "received." It was not. The reciprocal release was
not received. The recitation of receipt of consideration may be explained or disputed by parol evidence.
*Ehrlich v American Moninger Greenhouse Mfg. Corp.*, 26 N.Y.2d 255, 258 (1970) ("The recitation of receipt
of consideration is a 'mere admission of a fact which, like all such admissions, may be explained or disputed
by parol evidence'").

> expressed in the writing. Quite obviously, though, the parol evidence
> rule does not bar proof of every orally established condition
> precedent, but only of those which in a real sense contradict the terms
> of the written agreement."

*Hicks v. Bush*, 10 N.Y. 2d at 491;  *Smith v. Dotterweich*, 200 N.Y. at 299.[22]

In *Long Island Trust Co. v. International Institute for Packaging Education, Ltd.*,

38 N.Y. 2d 493, 497 (1976), the New York Court of Appeals re-affirmed the above rule.  It

further held that the signor of guarantee can prove with parol evidence that its delivery was

conditioned on an oral condition precedent that the guarantee would not become effective

until a third party endorsed the underlying note.  The Court found that such a term did not

contradict the express terms of the guarantee, even though the writing did not contain such

a condition.[23]  *Also see Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming

Corp.*, 269 F. Supp 2d 206 (S.D.N.Y. 2003).

Here, the Release did not state it was unconditional.  Nothing in the Release "in a

real sense" expressly contradicts the condition that its delivery would not be effective until

the reciprocal release was delivered.  Parol evidence of the condition is thus admissible.

The cases in which an oral condition precedent have not been allowed admittance

into evidence deal with conditions that are not fundamental to the transactions.  Here, the

reciprocal release was fundamental to the transaction.  It made no sense for the documents

---

[22]    Oral evidence of a condition subsequent to an integrated contract is barred by the parol evidence
rule. *Ruppert v. Singhi*, 243 N.Y. 156 (1926).  A condition subsequent is a promise that excuses performance
under a contract, if not fulfilled.  The contract was delivered and effective.   The condition would undo the
contract.  Oral evidence of such a condition is barred.  Here, Sami's allegation is that the delivery of  Release
was conditioned on the delivery of the reciprocal release.  The Release was not effective until the condition
was performed.

[23]    Had the guaranty stated that it was unconditional, the result would have been different.

delivered by Sami to have any effect if he did not receive the reciprocal release.  He simply did not give up his shares for nothing in return  The stock agreements had no effectiveness until Sami received the reciprocal release.

> "The manual transfer of an instrument, in form a complete contract, does not, however, bar parol evidence that it is not to become binding until the happening of some condition precedent resting in parol, or that the transfer is for a special purpose. It is a question of fact whether any written agreement, though in possession of the obligee, has been delivered by the obligor as a binding agreement, or whether any delivery that has been made is conditional only. *Act and intention are the essential constituents of a delivery which makes the instrument operative according to its terms.* The final question is, did the obligor do such act in reference to it as evidences an intention to give it, in the possession or control of the obligee, effect and operation according to its terms.  Whenever there has been a delivery of the instrument for the purpose of giving it such effect, it becomes a present and completed contract, and parol evidence cannot be given to contradict, vary or modify its terms."

*Grannis v Stevens*, 216 N.Y. 583, 587-8 (1916)(emphasis added; citations omitted).  Sami's intention was not to allow the delivery of the documents to have any effect until he received the purpose of the transaction.

The merger clauses and the no oral modification clauses in the stock agreements are not a bar to the evidence of the condition precedent, since they are boilerplate.   As the court stated in *Tropical Leasing, Inc. v Fiermonte Chevrolet, Inc.*, 80 A.D.2d 467, 469 (4th Dep't 1981), in allowing evidence of an oral contingent precedent, the merger clause  "has no significance until there is a contract."[24] In this case, where the delivery of the reciprocal

---

[24]       The Court in *Morgan Stanley,* 269 F. Supp 2d at 206 decided that some boilerplate clauses are inconsistent with an oral condition precedent. The Court also recognized there that New York courts are not unanimous on this issue.

release was so central to the purpose of the transaction as a whole, the Court should allow

the evidence that its delivery was a condition to the effectiveness of all the documents.

**K.    Laches Is A Defense Which is Not Properly**
**Determined on these Motions to Dismiss**

The mere lapse of time, without a showing of prejudice, will not sustain a defense

of laches. *Republic of Turkey v. Christie's Inc.*, 62 F.4th 64, 71 (2d Cir 2023)(affirming

dismissal after trial). Laches, generally, is a fact intensive defense. *Republic of Turkey,* 62

F.4th at 73-4.

Defendants are moving under Rule 12(b)(6), failure to state a claim. The

Complaint states a claim. For Defendants to show prejudice, they would have to submit

matter outside the Complaint, which is inappropriate on a motion to dismiss. [25] In any

event, Defendants have not even attempted to show prejudice. They merely rely on the

passage of time as a basis for their claim that laches applies. This is not enough.

The cases that Defendants have cited that require one who learns about a fraud not

to delay, see Liptis Memorandum at 16, deal with situations where the proposed rescinder

was taking the benefits of the contract and took a wait and see attitude. *See Clearview*

*Concrete Prods. Corp. v S. Charles Gherardi*, 88 A.D.2d 461 (2d Dept 1982). Here, only

Sami has lost by the delay. He has, to date, not received any benefit from the fraudulently

induced transaction as it stands.

---

[25]    The Court in *Zuckerman v Metro. Museum of Art*, 928 F. 3d 186 (2d Cir. 2019) held that laches can
be asserted on a 12(b)(6) motion when the prejudice is apparent from the face of the complaint. In that case,
the delay was sixty years. Here, no prejudice has been asserted or is apparent.

**L.**    **Sharif Waived Service of Process**

Of course, a court, in a typical case, does not have jurisdiction unless the defendant is served with process.  Of course, the Stipulation[26] by which Defendants waived the service of process could have been clearer.  Those are the propositions which the opinions cited by Sharif in his Memorandum teach us.  However, the opinions do not take away from the fact that the plain meaning of jurisdiction is the power of the Court to adjudicate a claim. See the accompanying Jaskiel Declaration, dated July 18, 2025.  In this case, by signing the Stipulation, Sharif agreed that the Court has the power to adjudicate the claims which Sami has filed against Sharif.  He waived the service of process.

If the Court does not agree with this interpretation of the plain meaning of the Stipulation, Sami respectfully requests an extension of time to serve Sharif with process.

**M.**    **If Claims In this Action Survive, this Action and
the Note Case Will Likely be Joined in Some Manner**

OHC claims, without analysis, that Sami's claims in this action should have been compulsory counterclaims in the Note case.[27]   "The test for determining whether a counterclaim is compulsory is whether a logical relationship exists between the claim and the counterclaim and whether the essential facts of the claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Adam v Jacobs*, 950 F.2d 89, 92 (2d Cir 1991)(citations and quotation

---

[26]    The Stipulation, dated November 12, 2024, was so ordered as Document No. 21.

[27]    The Note case is *Omar Holding Corp. v. Sami Omar*, Civ. No. 19-6360 (MMG) in this Court, in which OHC seeks to collect the Note discussed above.

marks omitted).  The Note case arises out of events which took place between 2015 and 2017.  This action arises out of events which took place in 2018.  While there is significant overlap in background and, if Sami obtains a reciprocal release in this action,[28] the Note action would be barred, the actions arose out of different transactions.[29]  OHC has not established that the claims in this action should have been compulsory counterclaims in the Note case.

Nevertheless, the parties have discussed with the Court joining these actions, at least for discovery purposes,[30] and the parties were amenable to that, should this action survive.  The concern in the opinions cited by OHC was duplicative litigation and efficiency of judicial resources. OHC Memorandum at 16.[31]  If this action survives, and the actions are joined, that purpose will be accomplished.

---

[28]     The primary relief which Sami seeks is voiding of all the Release and the Stock Agreements. Receipt of a reciprocal release is alternative relief sought.

[29]     OHC mistakenly claims that causes of action relating to the reciprocal release were raised in Sami's answer to the Note case.  They were not.  The reciprocal release was not even mentioned in the answer.

[30]     See Joint Status letter of counsel to both cases, Document No. 113 in the note case.

[31]     The cases cited either dealt with actions in two separate courts or where the prior action was already adjudicated.

## **CONCLUSION**

For all the reasons stated above[32], Sami respectfully requests that Defendants'

motions to dismiss be denied in their entirety and that the Court such other and further

relief, as requested herein, as may be just under the circumstances.

Dated: Brooklyn, New York
        July 18, 2025

                                        s/ Solomon J. Jaskiel
                                        SOLOMON J. JASKIEL, ESQ.
                                        *Attorney for Plaintiff Sami Omar*
                                        1601 East 23rd Street
                                        Brooklyn, New York 11229
                                        (917) 968-8368  (SJJ-0671)
                                        soljas@gmail.com

---

[32]     Solomon Jaskiel certifies that this memorandum of law complies with the word count limitation as
enlarged by the Court.   The word count generated by the Word program by which the document was
prepared shows a total word count of 9619.