USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/23/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAMI OMAR,

Plaintiffs,

-against-

SHARIF OMAR, LIPTIS HOLDINGS LLC, LIPTIS PHARMACEUTICALS USA, INC., OMAR HOLDING CORP., NEW LIFE HOLDING CORP.,

Defendants.

24-CV-04758 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiff Sami Omar brought this action against his brother, Sharif Omar, and four companies that, prior to the events giving rise to this suit, the brothers jointly owned and led: Liptis Holdings LLC, Liptis Pharmaceuticals USA, Inc., Omar Holding Corporation, and New Life Holding Corporation (together "Defendants").

Sami alleges a pattern of deceptive and coercive behavior—spanning many years—which culminated in an agreement releasing the Defendants from any liabilities as to Sami, and in Sami's transfer of his interests in the Defendant companies to Sharif for nominal amounts. Sami now seeks rescission of those agreements based on unconscionability, lack of consideration, and fraud. In the alternative, Sami alleges breach of contract stemming from Sharif's alleged failure to deliver on a promise to give Sami a reciprocal release from liability.

Before the Court are Defendants' motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

For reasons stated below, the motions are GRANTED in part and DENIED in part.

## BACKGROUND

## I. RELEVANT FACTS[1]

### A. Development of the Family Business

Between 2004 and 2009, brothers Sami and Sharif Omar assumed responsibility over their father's companies. Compl. ¶ 14. The Omar family businesses include Liptis Entities, Omar Holding Corp. ("OHC"), and New Life Holding Corp. ("New Life") (together, "Family Business" or "Corporate Defendants"). *Id.* ¶ 13. Liptis Entities is made of Liptis Holdings LLC ("Liptis Holdings") and Liptis Pharmaceuticals USA, Inc. ("Liptis Pharma"): Liptis Pharma produces and sells pharmaceuticals on land owned by Liptis Holdings. *Id.* ¶ 12. OHC and New Life own real estate in New York, which they lease to third parties for profit. *Id.* ¶ 13.

Sami alleges that between 2004 and 2009, his and Sharif's father turned over control of the Family Business to the brothers "for the benefit of the members of the family," including Sami, Sharif, and their sisters. *Id.* ¶ 14. Each family member thus had ownership interest in each of the corporations comprising the Family Business, and each family member was allotted their share of the businesses' profits, at Sharif's discretion. *Id.* ¶¶ 19, 22, 36–37.

While Sami provided the Family Business with operational support until mid-2017, Sharif "was granted and assumed primary control of the Family Business." *Id.* ¶¶ 15, 18. Sharif directed and oversaw the Family Business's finances with little to no input from Sami or the other family members. *Id.* ¶¶ 16–17. The members of the Omar family trusted Sharif and Sami—the two eldest male family members—to run the Family Business for their collective

[1] Unless otherwise indicated, the facts that follow are drawn from Plaintiff's Complaint, Dkt. No. 1 ("Compl.") and are assumed true for purposes of deciding the motion to dismiss. The Court refers to the parties' memoranda in support of and in opposition to the motions to dismiss as follows: Dkt. No. 31 as "Liptis Mot."; Dkt. No. 34 as "New Life & OHC Mot."; Dkt. No. 41 as "Opp."; Dkt. No. 47 as "New Life & OHC Reply"; and Dkt. No. 48 as "Liptis Reply."

benefit. *Id.* ¶ 20–22. And Sami, ten years Sharif's junior, understood Sharif would assume primary control. *Id.* ¶ 7, 15.

Under the brothers' leadership, the Family Business, and Liptis Pharma in particular, was successful. *Id.* ¶ 21. To facilitate Liptis Pharma's expansion, Sharif used OHC and New Life's property as collateral for loans, without the family's knowledge or consent. *Id.* ¶¶ 23–24. Although Liptis Entities received the proceeds from the loans, Sami alleges that Sharif induced him to assume the liability and become a "strawman borrower" for the transactions. *Id.* ¶ 26. Sami further alleges that the loans "were intended to be repaid by the Liptis Entities, since they received the benefit of the loan," and that it was understood between Sharif and Sami that the debts ostensibly owed by Sami as nominal borrower were not supported by consideration. *Id.* ¶ 28. Nonetheless, Sami signed a note memorializing his assumption of liability for the loan. *Id.* ¶ 27.

At some unspecified time, presumably before October 2017, other family members transferred their ownership interests in the Liptis Entities to Sharif, resulting in his 50% ownership. *Id.* ¶ 29. Around the same time, Sharif assumed "total control over OHC." *Id.* ¶ 30.

**B. October 2017 Agreements**

In October 2017, Sharif initiated a meeting with Sami regarding Sami's shares in Liptis Entities. *Id.* ¶ 46. At that time, Sami owned 45% of both the Liptis Pharma and Liptis Holdings shares. *Id.* Sharif owned the balance of each entity.

During the meeting, Sharif told Sami that Sami would be fired by each of the Family Business's companies, and that he would no longer receive proceeds from the Family Business, unless Sami agreed to sell Sharif the majority of his shares that day for a nominal amount. *Id.* ¶ 47–48. Sami, believing he had "no choice but to agree," transferred his entire ownership stake in Liptis Entities, save 1%, for a total of $125,000 ("2017 Liptis Agreement"). *Id.* ¶ 50; Liptis

Mot. at 3. Sami also transferred 97% of his New Life stock ("2017 New Life Agreement") (together "2017 Agreements"). New Life & OHC Mot. at 3. Sami was not represented or advised by a lawyer for any of these transactions. Compl. ¶ 54.

The 2017 Agreements contained a release from liability, a merger-and-integration clause, an indemnification clause, and an oral non-modification clause. Liptis Mot. at 3–5.

**C. June 2018 Agreements**

Following the 2017 Agreements, Sharif effectively pushed Sami out of the Family Business and withheld his salary, forcing him to resign. Compl. ¶ 55. Sharif also ceased payments to other family members. *Id.* ¶ 56. Sami and Sharif engaged in a series of negotiations to sever their remaining professional relationship; Sami intended to relinquish his remaining stock in the Family Business in exchange for "a complete release" from liability and alleges that the parties agreed to exchange general releases among each other and the Family Business. *Id.* ¶¶ 58–59.

The negotiations culminated on or around June 26, 2018, with the execution of a bundle of agreements: (1) releasing Sharif, the Family Business, any business related to the Family Business and Sharif's immediate family from any claim or action from Sami ("General Release").[2]; (2) selling Sami's remaining 1% interest in Liptis Entities for a total of $2,842 ("2018 Liptis Agreements").[3]; (3) selling Sami's around 31% shares in OHC to Sharif for $577,355 ("2018 OHC Stock Purchase Agreement").[4]; and (4) selling Sami's remaining 1%

[2] *See* Dkt. No. 30-6.

[3] *See* Dkt. Nos. 30-4–30-5.

[4] *See* Dkt. No. 30-7. Sami alleges that his shares in OHC were worth more than $6 million at the time of sale. Compl. ¶ 63.

interest in New Life ("2018 New Life Agreement.").[5] (together "2018 Agreements" or "Agreements"). *Id.* ¶ 62; New Life & OHC Mot. at 5.

The 2018 Agreements contained a non-modification clause, a clause acknowledging that parties were advised to have counsel, and a merger and integration clause..[6] The Agreements did not contain a reciprocal release—the General Release only released Sharif and the Family Business from liability, but did not release Sami.

Sami alleges that he was confronted with the 2018 Agreements when Sharif's lawyer traveled to Las Vegas for in-person signing. He noticed the lack of reciprocal release, called Sharif to demand that a reciprocal release be delivered, and Sharif "promised Sami that as soon as he received Sami's release he would send Sami a signed Reciprocal Release.".[7] Compl. ¶¶ 59–61. Trusting this promise, Sami then executed the 2018 Agreements. *Id.* ¶¶ 60–62. The Reciprocal Release was never provided. *Id.* ¶ 66.

## II. PROCEDURAL HISTORY

Sami Omar initiated this suit on June 21, 2024. *See* Compl. At the time, there was an ongoing suit before this Court brought by OHC against Sami, seeking to recover over $ 7 million. *See Omar Holding Corp. v. Omar*, 19-CV-06360 (MMG). This Court accepted the cases as related. *See* Dkt. No. 3.

---

[5] *See* Dkt. No. 33-4. The 2018 New Life Agreement is not disputed in this action but is included for completeness.

[6] Although the Complaint does not append or integrate the agreements at issue, because the complaint "relies heavily upon [their] terms and effect," the Court is permitted to consider them. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[7] In his Opposition to Defendants' motions to dismiss, Sami clarifies that before the lawyer presented Sami with the agreements, Sami asked the lawyer to review the agreements, and the lawyer did not comply with that request. Opp. at 7.

In July 2024, the Court stayed both cases *sine die* while the parties engaged in settlement negotiations in conjunction with a related matter pending in New York state court. Dkt. No. 14. That stay was in place until February 5, 2025, when the parties indicated they were unable to reach a global settlement. Dkt. No. 23.

The Complaint brings four causes of action against Sharif and the Corporate Defendants: (1) rescission of the June 2018 Agreements for lack of consideration; (2) rescission of the Agreements for fraud in the inducement; (3) rescission of the Agreements for unconscionability; and (4) breach of contract for failure to deliver the Reciprocal Release. Compl. ¶¶ 71-89.

Defendants filed their motions to dismiss in two groups: Dkt. No. 29 ("Liptis Mot." (filed by Liptis Entities and Sharif)), Dkt No. 32 ("New Life & OHC Mot."). Defendants argue for dismissal on a number of grounds: (1) the Corporate Defendants are not parties to the Agreements; (2) the valid General Release bars all claims; (3) Sami does not adequately plead unconscionability, lack of consideration, or any other defense to void the Agreements; (4) the doctrine of laches defeats the claims; (5) the statute of frauds bars the breach of contract claim; (6) the claims were required to be asserted as counterclaims in the related action; and (7) Sami failed to effectively serve Sharif. *See* New Life & OHC Mot. at 1; Liptis Mot. at 1..[8]

**DISCUSSION**

All claims must be dismissed as to the Corporate Defendants because they are not parties to the Agreements at issue and, as such, have no obligations with respect to their formation or enforcement. Because the contract claims necessarily rely on the validity of the Agreements, which, if enforceable at all, would contain a binding General Release, the breach of contract claim and the failure of consideration claim must also be dismissed as a matter of law.

---

[8] The Court will address the Defendants' claims jointly.

The Court does not agree, however, that Sami failed to adequately plead defenses to the Agreements' formation—namely, fraud in the inducement and unconscionability. The Court also does not agree that the Complaint as to Sharif should be dismissed because of failure to serve and instead uses its discretion to grant a *nunc pro tunc* extension for service of process..[9]

## I. LEGAL STANDARD ON A MOTION TO DISMISS

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))..[10] Courts are not required to accept as true legal conclusions, and "[t]hreadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. While a plaintiff is not required to provide "detailed factual allegations" in the complaint, the facts pleaded "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The court must accept the allegations in the pleadings as true and draw all reasonable inferences in favor of the plaintiff. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents properly considered "integral" to or incorporated by the complaint, *i.e.*, documents as to which the complaint "relies heavily upon [their] terms and effect." *See Chambers*, 282 F.3d at 153.

---

[9] The Court need not address Defendants' additional bases for dismissal since it has granted the motion with respect to the Corporate Defendants.

[10] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

## II. ALL CLAIMS AGAINST THE CORPORATE DEFENDANTS MUST BE DISMISSED BECAUSE THEY ARE NOT PARTIES TO THE AGREEMENTS

Defendants move to dismiss the Corporate Defendants from this action because none is party to any agreement at issue. Liptis Mot. at 17–18; New Life & OHC Mot. at 8–9. Defendants highlight that—on the face of the complaint—there is no claim for relief against the Corporate Defendants that is plausible because the Corporate Defendants are not in privity of contract with Sami and have no obligations under the agreements. Liptis Mot. at 17–18; New Life & OHC Mot. at 8–9. The Court agrees.

It is hornbook law that, generally speaking, "a contract cannot bind a non-party" nor make a non-party liable for a breach of that contract. *E.E.O.C. v. Waffle House, Inc.,* 534 U.S. 279, 294 (2002); *Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1255–56 (S.D.N.Y. 1995). The same is true of a rescission claim: it simply "cannot be maintained against a person who was not a party to the contract." *Steinberg v. Sherman*, No. 07-CV-1001 (WHP), 2008 WL 2156726, at *7 (S.D.N.Y. May 8, 2008).

There are narrow exceptions allowing non-signatories to a contract to be named as a defendant in a breach action where "the party is in privity with the plaintiff or has assumed the obligations of the contract." *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 73 (S.D.N.Y. 1999). Traditional state law principles like alter ego, corporate veil-piercing, or third-party beneficiary can also provide means to establish assumption or otherwise bring a non-party within the obligations of the contract. *See, e.g., Arther Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). But Sami does not allege any such privity or assumption of obligations, and he offers no response to Defendants' motions to dismiss on these grounds..[11]

[11] Even if the Court were to read into Sami's pleadings an argument that the companies are Sharif's corporate shell and are therefore parties to the Agreements, Sharif is "a natural person," which is legally "distinct from the corporation itself." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158,

## III. CAUSES OF ACTION ONE AND FOUR MUST BE DISMISSED AS A MATTER OF LAW

### A. The 2018 Agreements are Not Void for Lack of Consideration

Sami's first cause of action seeks rescission of the 2018 Agreements because the Agreements were purportedly contingent upon Sharif's delivery of the signed Reciprocal Release, which Sharif never delivered. Compl. ¶¶ 71–72. Sami alleges that, as a result, the Agreements are void for lack of consideration. *Id*. ¶ 74.

It is true that there appears to be no consideration for the General Release if its execution is treated as a separate transaction than the other 2018 Agreements. But New York law does not require consideration to make a written release binding. N.Y. GEN. OBLIG. § 15-303; *Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 561 (S.D.N.Y. 2009). In any case, all parties agree that the 2018 Agreements should be treated as one Agreement: by Sami's admission, the 2018 OHC Stock Purchase Agreement, the 2018 Liptis Agreements, and the General Release were part of "one package" intended to disentangle Sami from the Family Business. Compl. ¶ 67. Thus, in one fell swoop, Sharif purchased Sami's remaining shares in the Liptis Entities and in OHC for a total of $580,197. *See* Dkt. Nos. 30-4, 30-5, 30-7. Separate consideration for each item is not necessary in a series of agreements treated by the parties as one. *See* Restatement (First) of Contracts, § 83; *see also Miller v. Super Seal Container Corp.*, 62 F. Supp. 578, 579

163 (2001). Indeed, "incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." *Id.* And no showing that could establish a basis to pierce the corporate veil has been made.

(D.D.C. 1945) (declining to void a release for lack of consideration when signed in the same bundle as a stock purchase agreement)..[12]

Because the remedy for a broken promise is not rescission, and because the 2018 Agreements—as a whole—were made in exchanges for consideration, Sami's first cause of action must be dismissed against all Defendants as a matter of law.

### B. Sami's Fourth Cause of Action Cannot Survive if the Contracts are Valid

Sami's fourth cause of action alleges that Sharif's failure to deliver the Reciprocal Release constitutes a breach of contract and that Sharif (and the Family Business) should be ordered to deliver the Reciprocal Release. Compl. ¶¶ 87–89. This argument necessarily fails as a matter of law and must be dismissed.

Sami may only make out a breach of contract claim if there is a valid contract to breach. And if the 2018 Agreements—taken as a bundle—are a valid contract, that bundle includes the General Release, which bars "all actions, causes of action . . . agreements, promises . . . and demands whatsoever . . . ." Dkt. No. 30-6. Under New York law, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Int'l Bus. Mach. Corp. v. Simon*, 376 F. Supp. 3d 292, 300 (S.D.N.Y. 2019).

Because a breach of contract claim is squarely contemplated by the General Release, and the claim may only be asserted if the General Release is valid, Sami's breach of contract claim must be dismissed..[13]

## IV. CAUSES OF ACTION TWO AND THREE SURVIVE AS TO SHARIF

---

[12] Sami's argument that his OHC shares were sold for "illusory consideration" because Sharif executed this payment by forgiving Sami's Liptis debts, which he alleges were already forgiven as part of the 2017 Release, fails for the same reason. Compl. ¶ 69.

[13] The Court need not reach the various other potentially valid bases to dismiss Count Four, such as the 2018 Agreements' merger clause.

**A. Unconscionability is Adequately Pled**

"The doctrine of unconscionability seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties." *United States v. Martinez*, 151 F.3d 68, 74 (2d Cir. 1998). There must generally be a showing that a contract or clause is both procedurally and substantially unconscionable, meaning an "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121–22 (2d Cir. 2010) (quoting *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999)).

Sami asserts that allowing the OHC Stock Purchase Agreement and the General Release to stand would be "both procedurally and substantively unconscionable" because the agreements lacked sufficient consideration. Compl. ¶¶ 80–86. Defendants argue that this claim must be dismissed because Sami fails to plead or otherwise show that he is an unsophisticated party. *See* Liptis Mot. at 13–14.

While inadequate consideration alone cannot provide the basis for unconscionability, Sami pleads a number of facts that, resolving all reasonable inferences in Sami's favor at this stage of the case, adequately plead coercive conduct, unequal bargaining power, and a lack of meaningful choice sufficient to elevate the Agreements' one-sided terms to unconscionability for purposes of a motion to dismiss. *See Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 227 (2d Cir. 2023) (cautioning against "misappropriat[ing] the unconscionability doctrine . . . for what is substantively a challenge to the adequacy of consideration" when there is an "absence of fraud or other unconscionable circumstances."). Sami alleges that Sharif's deception began well before the memorialization of the 2018 Agreements—that Sharif has engaged in a consistent pattern of coercion by leveraging his professional and personal influence

over Sami. The circumstances surrounding the signing of the 2017 Agreements, though not the subject of this action, may reasonably be construed as part of the same bundle of interactions that culminated in the 2018 Agreements; any inequitable circumstances can therefore be imputed as part of the same sequence of events. *See Bank of Am. Nat. Tr. and Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F. Supp. 260, 268 (S.D.N.Y. 1990) ("The [c]ourt must look to the contract as a whole, and the atmosphere in which it was entered into in order to determine unconscionability"). Springing the October 2017 meeting on Sami, who was uncounseled, and offering a take-it-or-leave-it proposition to sell Sami's shares at a loss, are together hallmarks of the sort of high-pressure tactics contemplated by the unconscionability doctrine. When it came time to sign the 2018 Agreements, Sami was not given the opportunity to review the Agreements in advance, and he was unduly surprised by the terms therein when confronted with them by an attorney who flew across state lines to pressure Sami into signing the agreement then and there. *See e.g.*, *Leasing Serv. Corp. v. Broetje*, 545 F. Supp. 362, 366 (S.D.N.Y. 1982) (calling the "purpose of the doctrine of unconscionability [] to prevent oppression and unfair surprise").

The Court is not convinced that, as Defendants suggest, Sami must specifically plead he is an unsophisticated party in order to adequately plead unconscionability; the Complaint sufficiently alleges that Sharif exploited his superior bargaining power over Sami to deprive him of a meaningful choice in the process.

**B. Fraud in the Inducement is Adequately Plead**

In his second cause of action, Sami alleges that Sharif engaged in fraud, on a theory of fraudulent inducement, when he coaxed Sami into signing the Agreements under the pretense of delivering a Reciprocal Release, with no intent to deliver on that promise. Compl. ¶¶ 75-79. As a result, Sami claims, the General Release and accompanying agreements should be rescinded. *Id.* ¶ 79.

Plaintiffs seeking to invalidate a release or other contractual agreements due to fraudulent inducement must "establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011) ("*Centro Empresarial II*").[14] A plaintiff asserting fraudulent inducement must also satisfy the "heightened pleading standards of Federal Rule of Civil Procedure 9(b), which provides that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 246–47 (S.D.N.Y. 2011) (quoting Fed. R. Civ. P. 9(b)). "But despite Rule 9(b)'s insistence on specificity when pleading fraud claims, it does not elevate the standard of certainty that a pleading must attain beyond the ordinary level of plausibility." *Pilat v. Amedisys, Inc.*, No. 23-566, 2024 WL 177990, at *2 (2d Cir. Jan. 17, 2024) (summary order).

Defendants are right to highlight that a general release typically "prevents plaintiffs from . . . bringing an action for fraud based on misrepresentations predating it," *Arfa v. Zamir*, 952 N.E.2d 1003, 1004 (N.Y. 2011), and that a party may challenge a release as fraudulently induced only "if it can identify a separate fraud from the subject of the release," *Centro Emprsarial II*, 952 N.E.2d at 1000. True, Sami has not asserted that the alleged fraud is separate from the subject of the release and, to the contrary, Sami agrees with the Defendants that "[t]he [Stock] Agreements are not separate from the Release" and that "[t]he stock agreements, the Release *and*

[14] Fraud claims based on a theory of fraudulent inducement require the same elements of a straightforward fraud claim. *See Vinci Brands LLC v. Coach Servs., Inc.*, No. 23-CV-5138 (LGS) (VF), 2024 WL 4370841, at *4 n.2 (S.D.N.Y. Oct. 2, 2024).

the reciprocal release that Sharif agreed to give comprise one transaction and should [be] treated that way." Opp. at 11–12.

Nonetheless, "[c]ourts will not enforce a release that is the product of fraud." *Becher v. Tyco Int'l. Ltd.*, 27 Fed. Appx. 48, 51 (2d Cir. 2001) (citing *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)). And "there are a number of cases, post-*Centro*, that do not consider the question of 'separate fraud' at all, but simply find the claim for fraudulent inducement sufficiently pled . . . and not barred by the release at issue." *Sillam v. Labaton Sucharow LLP*, No. 21-CV-6675 (CM), 2022 WL 1448673, at *4 (S.D.N.Y. May 9, 2022) (collecting cases). These cases reason that a plaintiff who has plausibly alleged fraudulent inducement "is entitled to the equitable remedy of rescission or non-enforcement of the release." *Id.*

The Court cannot ignore the Complaint's allegations of Sharif's plainly deceptive behavior leading up to Sami's signing of the 2018 Agreements. Despite his requests, Sami was not given an opportunity to review the Agreements before being confronted with them in person. When Sami discovered that the Agreements lacked a Reciprocal Release, he called Sharif, who represented that he would deliver the Release once Sami signed the Agreements. In the context of the ongoing negotiations, which, according to Sami's allegations, were explicitly premised on an exchange of a Reciprocal Release, Sharif's representation was plausibly intended to induce Sami into signing the Agreements.

At the motion to dismiss stage, these facts are sufficient to allege that Sharif made a material misrepresentation of material fact, and that Sami justifiably relied on that representation. *See JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004) ("In assessing whether reliance on allegedly fraudulent misrepresentations is reasonable or justifiable,

New York takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision"); *DDJ Mgmt., LLC v. Rhone Group L.L.C.,* 931 N.E.2d 87, 91–92 (N.Y. 2010) ("The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive"); *Bloss v. Va'ad Harabonim of Riverdale*, 610 N.Y.S.2d 197, 198 (1st Dept. 1994) ("[w]here fraud . . . in the procurement of a release is alleged, a motion to dismiss should be denied"). As such, Sami's rescission action for fraud survives..[15]

## V. THE CLAIMS ARE NOT DISMISSED AGAINST SHARIF FOR FAILURE TO SERVE

Finally, Sharif argues that all claims should be dismissed against him because Sami failed to effectuate service against Sharif. Liptis Mot. at 18. Sami responds that Sharif waived service of process through a November 12, 2024 stipulation signed by all parties, which waives "all Jurisdictional Defenses." Opp. at 29; Dkt. No. 21.

Sharif is correct that service of process is the vehicle by which courts assert jurisdiction over a party and is not itself a "jurisdictional defense," *see Kumar v. Alhunaif*, 23-CV-00321 (DEH), 2025 WL 833547, at *5 (S.D.N.Y. Mar. 17, 2025), and is generally correct that "[a]n attorney's inadvertence, neglect, mistake or misplaced reliance does not constitute good cause." *Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 306 (S.D.N.Y. 2013). It is "well settled," however, "that district courts have discretion to grant extensions [under Rule 4(m)] even in the absence of good cause." *Buon v. Spindler*, 65 F.4th 64, 75 (2d Cir. 2023); *see*

[15] Defendants' argument that crediting any evidence of fraud—namely, Sharif's oral representations—would violate the parol evidence's bar on the introduction of extrinsic evidence to contract the terms of a writing is also unavailing. *See* Liptis Mot. at 12–13. Introduction of extrinsic evidence to make out a fraudulent inducement claim is a "well-known exception to the parol evidence rule." *Feder Kaszovitz LLP v. Rosen*, No. 17-CV-02954 (CM), 2019 WL 1460754, at *2 (S.D.N.Y. Mar. 18, 2019) (quoting *Petrello v. White*, 412 F. Supp. 2d 215, 226 (E.D.N.Y. 2006), *aff'd*, 344 F. App'x 651 (2d Cir. 2019)).

*also Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007) (holding extension proper "even in the absence of good cause"); *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 66 (S.D.N.Y. 2010) (similar); *George v. Pro. Disposables Int'l, Inc.*, 221 F. Supp. 3d 428, 435 (S.D.N.Y. 2016) (similar).

In exercising that discretion, courts consider: (1) whether the statute of limitations would bar refiling; (2) whether the defendant had actual notice of the claims; (3) whether the defendant attempted to conceal the defect in service; and (4) whether the defendant would be prejudiced by an extension. *DeLuca*, 695 F. Supp. 2d at 66.

Factors one, two, and four weigh in Plaintiff's favor. First, the statute of limitations for contract cases in New York is six years. N.Y. C.P.L.R. § 213(2). The contracts were effectuated on or around June 26, 2018, and any related claim would likely be time-barred if refiled now, which would be a particularly harsh consequence for a misunderstanding regarding service (particularly where there was actual notice and no prejudice). *See DeLuca*, 695 F. Supp. 2d at 67. Second, Sharif had actual notice of the claims asserted in the Complaint. He is actively involved in the related case, No. 19-CV-06360 (MMG), which has been ongoing since 2019. He is the majority shareholder in and owner of each company comprising the Family Business, who are the Corporate Defendants in this case. The Corporate Defendants here have actively litigated this case and have asserted this defense in a joint motion with Sharif. Accordingly, any suggestion that Sharif does not have actual notice of the claims herein is preposterous..[16] Further, no party identifies any prejudice from an extension, and none is apparent in light of Sharif's actual notice and the Court's undisputed personal jurisdiction over him in this matter.

[16] Indeed, Sharif, in a declaration supporting OHC's motion for pre-judgment attachment and injunctive relief in the related case, Sharif affirmed under penalty of perjury knowledge of the facts and circumstances of the related case. No. 19-CV-06360 (MMG), Dkt. No. 56.

Factor three lies somewhere between the parties but leans more in Sami's favor. Though there is no evidence that Sharif actively concealed the lack of service, he has been aware of the defect since September 19, 2024—the date service was due—and failed to raise it with the Court until filing this Motion, some six months later.

This Court, and the Second Circuit, have a "strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011). Where, as here, a Defendant had actual notice of, and arguably participated in, a suit, and it would not be prejudiced by an extension of time for service, the Court declines to dismiss the case for a plaintiff's good-faith failure to serve. Instead, Sami is ordered to effectuate service on Sharif within 30 days of this Order..[17]

**CONCLUSION**

For the foregoing reasons, the motions to dismiss are GRANTED in part and DENIED in part. Specifically, Counts One and Four are DISMISSED as to all defendants. Counts Two and Three are DISMISSED only as to the Corporate Defendants, but survive as to the individual defendant, Sharif Omar.

The Clerk of Court is respectfully directed to terminate Dkt. Nos. 29 and 32, and terminate all Defendants other than Sharif Omar from the docket of this case.

Dated: September 23, 2026
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge

[17] The Court need not address Defendants' additional bases for dismissal since it has granted the motion with respect to the Corporate Defendants on other grounds.